**C & H NATIONWIDE, INC., Edward Stanton Webber, and Ecotech International, Inc., Appellants,**

v.

**Linda Gail THOMPSON, Individually and as Executrix of the Estate of Jerry Wayne Thompson, Troy Neal Thompson, Theresa Thompson Fields, and Energys Coating Company, Appellees.**

No. 01–90–00445–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 9, 1991.

Rehearing Overruled May 30, 1991.

Before PRICE,[1] BASS and STEPHENS[2], JJ.

## OPINION ON MOTION FOR REHEARING

PRICE, Justice (Assigned).

We deny the motion for rehearing of Ecotech International, Inc. ("Ecotech"). We withdraw our opinion of March 7, 1991, and we substitute the following opinion.

This is an appeal from a judgment in a wrongful death and survival action. The action was brought by Linda Thompson, individually and as executrix for the estate of Jerry Thompson, Troy Thompson, and Theresa Thompson Fields (collectively referred to as "Thompsons") against C & H Nationwide, Inc. ("C & H"), Edward Stanton Webber ("Webber"), Hugh Pratt d/b/a/ Pratt Truck Leasing ("Pratt"), Ecotech, Shell Oil Company and Shell Western E & P, Inc. (collectively referred to as "Shell"), and Energy Coatings Company ("Energy Coatings"). The jury verdict awarded damages of $8.2 million to the Thompsons. In addition, funeral expenses were stipulated at $5,720.35. Total damages were $8,205,720.35. The trial court deducted $6 million for payments made by Shell, C & H, Pratt, and Webber leaving $2,205,720.35. The court added prejudgment interest in the amount of $884,073.43, resulting in a total judgment to the Thompsons of $3,089,793.73. Ecotech, C & H, and Webber appeal this judgment.

On November 18, 1987, Jerry Wayne Thompson was killed when a 40–foot length of 10¾–inch pipe collided with the car he was driving south on Highway 59. The pipe fell off the tractor-trailer that was transporting it north on Highway 59.

C & H leased the tractor-trailer from Pratt, and Webber, an employee of C & H, drove it. The pipe was owned by Shell. It was being transported from a facility of Energy Coatings, which had recently coated the pipe with epoxy. Energy Coatings employees had loaded the pipe onto the trailer, and Webber had secured it with straps. Shell employed Ecotech to monitor the coating process and monitor the loading and securing of the pipe to ensure the coating was not damaged.

Before trial, Shell reached a full and final settlement with the Thompsons paying them $3 million. In addition, in a partial settlement, C & H, Webber, and Pratt made payments to the Thompsons totaling $3 million. The Thompsons were paid $100,000 on May 6, 1988; $900,000 on January 25, 1989; $1 million on February 13,

---

1. The Honorable Frank C. Price, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

2. The Honorable Bill J. Stephens, retired Justice, Court of Appeals, Fifth District of Texas at Dallas, participating by assignment.

1989; and $1 million on February 17, 1989. In exchange for the payments, the Thompsons agreed to limit their claim for actual damages against C & H, Webber, and Pratt to $8.5 million; to abandon any claim for punitive damages against C & H, Webber, and Pratt; to credit C & H, Webber, and Pratt for up to $3 million against any damages awarded by the jury during trial; to indemnify C & H, Webber, and Pratt against any cross-actions for contribution brought by the other defendants in excess of $8.5 million; and to allow C & H, Webber, and Pratt veto power over any settlement between the Thompsons and any of the remaining defendants. However, C & H, Webber, and Pratt expressly continued to deny liability.

At trial, Calvin Barr testified that on November 18, 1987, he was employed by Ecotech to monitor the loading procedures of four C & H trucks leaving Energy Coatings. Barr stated that he had no experience, training, or instruction on safely securing pipe to a flatbed truck. Barr denied that he ordered Webber away from the truck while it was being loaded. Barr testified that Shell called for the pipe to be secured by straps. Six straps were used to secure the pipe on Webber's truck; four straps were used over the top with two more straps holding the lower layer. Barr stated that if a driver had tried to use padded chains to secure the load, he would have made a phone call to get permission, but he did not recall anyone trying to use padded chains on November 18, 1987.

Webber confirmed that he secured the pipe on his trailer with six straps, two over the first two tiers and four over the top. Webber testified that he intended to use stakes and padded chains to secure the pipe, but Barr prevented him from doing so. Webber claimed the rated strength capacity of the straps was about 15,000 pounds, and they appeared to be in good condition.

Webber stated that nothing indicated a problem with his load until the accident occurred. Webber had no idea or opinion as to the cause of the accident. The accident started to happen on a curve on an overpass. He first noticed a problem when he looked in his rearview mirror and noticed his load was shifting. He tried to control the load by easing into the left lane, but he never ran up on the shoulder between the lane and the median barrier. Webber denied that he hit the median barrier, or that he made any jerks on his wheel. Webber admitted that the lights of the truck were not on when the accident occurred.

Troy Thompson testified that on November 18, 1987, he and his father were driving south on Highway 59. He stated that it was pretty dark outside. He noticed a "great spark and flash of light" to the left. He then heard a pop and saw the pipe as it came through the car.

Jerry Hoover, a truck driver, testified, by deposition, that he witnessed the accident. He testified that it was dark, and he had the lights of his truck on. He passed Webber's truck and moved over into the center lane; Hoover and Webber were both traveling in the center lane. When Hoover slowed down in traffic, Webber moved to the left lane of traffic. After Webber passed Hoover, Hoover told Webber, on the CB radio, that Webber could come back over to the center lane. When Webber was coming off the bridge, Hoover heard an explosion and saw a spark-like flash and dust. As Hoover reached for his radio to tell Webber that he had a problem, he noticed the pipe starting to shift. Hoover saw Webber proceed from the center lane to the shoulder of the road, but he did not see Webber hit the median barrier.

Sydney Whitfield testified that he was driving his car on Highway 59 when he witnessed the accident. When he first saw the truck, it was traveling in the left lane, next to the median barrier. He did not see the truck change lanes, but it did sway toward the center lane. The truck continued straight, although the road curved to the right. Whitfield claimed the truck then bounced off the median barrier, and he saw sparks and lights flashing. He did not notice any straps breaking on the load.

On cross-examination, Whitfield admitted that he gave a slightly different statement

to the police officer on the scene of the accident. In his statement to the police, he said he was traveling in the right lane when he noticed the truck weaving on the overpass and then hit the median barrier.

Wade Wallace, an officer with the accident investigation division of the Houston Police Department, testified that on November 18, 1987, he investigated the accident involving the C & H truck. Wallace had 13 years experience as a police officer and 11 years experience in accident investigation. Wallace testified that when he arrived on the scene of the accident, he noticed a 40–foot section of pipe had penetrated Jerry Thompson's car. Based on the physical evidence and statements of the drivers and witnesses, he could find no evidence that the truck hit the median barrier. His opinion was that the straps had broken loose due to "adverse movement of the vehicle on the roadway" or the truck running up on the emergency shoulder. However, a section of approximately nine feet of the median barrier near the scene of the accident had been moved four to six inches, but he attributed the movement of the median barrier to the pipe striking it. In Wallace's opinion, the contributing factors to the accident were Webber's failure to maintain a single lane of traffic and failure to secure the load properly.

Wallace stated that the lugs of the left front tire of the truck had been eaten away, and the exhaust pipe and fuel tank were also damaged; he attributed that damage to the pipe hitting the truck as it came loose. In addition, the lugs had a gray material in them; initially, Wallace thought the material was concrete, but upon closer examination, he determined it was the coating on the pipes. When shown a picture of the tires on the truck, Wallace admitted that it was a "very good possibility" that the truck had run up against the median barrier; the right tires were covered with dirt, grime, and dust while the left tires were wiped clean as if the left tires had rubbed up against something. After hearing that Webber was driving without his lights on, Wallace stated that "the probability became greater" that the accident

happened because the truck hit the median barrier.

Dr. Gary Nelson, an expert on accident reconstruction, testified for the Thompsons. In Nelson's opinion, the strapping of the pipe on the trailer, two on the first two tiers and four over the top, was inadequate. Nelson's understanding of the standard promulgated by the Federal Highway Administration of the Department of Transportation dictated that the load would require 15 to 25 straps. Six straps would have allowed the load to move laterally causing the load to come off the trailer. In addition, Nelson felt the chocks, which were to prevent the pipe from rolling, were too small, anchored poorly, and the wrong shape.

On cross-examination, Nelson admitted he had not examined the accident scene. While inspecting the trailer, he noticed that the buckles used to hook the straps to the trailer were ripped and several lugs on the truck were damaged. He did not conduct any tests on the equipment, chocks, or straps involved in the accident. Furthermore, Nelson was unaware of the rating of the strength of the straps. Nelson admitted that if the capacity of the straps was 15,000 pounds, six straps would be adequate to satisfy standards but other factors were also important in determining a safe load. In Nelson's opinion, the load shifted on the trailer due to failure of a chock or road dynamics and the failure of a strap. However, Nelson admitted he could not determine why the pipe fell off the trailer, and it was possible that the truck had hit the median barrier.

Robert Bell, an expert on failure analysis, testified on behalf of Ecotech. He stated that the only way to cause the pipe to move sideways, as it did, was for the truck to move sideways and then stop. According to Bell, if the truck was moving straight down the road, there would have been no sideways motion; the sideways motion came from the truck changing lanes. Bell stated that the straps used to secure the load exceeded the standards set out by the regulations of the Department of Transportation. Because of the severity

of the damage to the truck, he concluded that a "great sudden force had to come upon the pipe." Simply changing lanes was not sufficient to cause the accident. In order for the pipe to land in the southbound lanes, the truck had to be against the median barrier when the pipe came off; otherwise, the pipe would not have had enough lateral force to fly over the median barrier and into the southbound lanes. Bell concluded that the truck hit the median barrier several times causing movement of the pipe that broke the straps. In his opinion, the accident was caused by Webber running into the median barrier with his load secured in a reasonable manner.

Lee Carr, an expert on accident reconstruction, testified on behalf of Energy Coatings. After performing tests on a trailer loaded as Webber's trailer was loaded, he concluded that good straps would not break from the force exerted on them by a truck making typical turns. Thus, according to Carr, two possibilities existed to explain how the pipe came off Webber's trailer. One possibility was that the straps used on Webber's trailer were not good and there was something wrong with the trailer; the straps would not hold properly. The other possibility was that a force greater than that experienced in regular turns acted on the trailer and the pipe. He performed a test that reconstructed the force experienced, in normal driving, by Webber's trailer as it traveled its route on November 18, 1987. Carr's conclusion was that the force on the route would not have caused Webber's load to break the straps, if they were good straps. He then examined the straps and the truck actually involved in the accident. He concluded that all six straps broke in one moment. Carr determined that a "massive force" caused the straps to break. He then did a reconstruction of the accident and concluded that the high force that caused the pipe to come off the truck was consistent only with the trailer hitting the median barrier.

Dr. John Allen, an economist, testified for the Thompsons as to the potential earning capacity of Jerry Thompson. Allen appraised Jerry Thompson's earning capacity at $1,393,475 and made a deduction for Jerry Thompson's projected personal consumption, which was valued at $379,752. He then determined that the undiscounted total loss to the Thompsons was $1,013,723. Discounted to present value, Allen valued the earning capacity loss at $958,363.

Linda Thompson testified that Jerry Thompson was born on August 9, 1939, and that he was in good health at the time of his death. She stated that Jerry Thompson was not extravagant with money. He planned toward retirement and put money in accounts for the future. She also testified that Jerry Thompson had a very close relationship with her and their children, Troy and Theresa. Alvis and Jan Moss, close friends of the Thompsons, also testified that Jerry Thompson had a close relationship with his wife and children.

The jury found that the negligence of C & H, Webber, Shell, Ecotech, and Energy Coatings proximately caused the accident. The jury assessed liability at 50% for C & H and Webber; 15% for Shell; 30% for Ecotech; and 5% for Energy Coatings. The jury found no gross negligence, so no punitive damages were awarded. The jury awarded $1 million for the pain and mental anguish suffered by Jerry Thompson. The jury found Linda Thompson suffered pecuniary loss of $1.5 million; loss of companionship of $2 million; mental anguish of $2 million; and loss of inheritance of $200,000. Furthermore, the jury valued Troy Thompson's loss at $50,000 for pecuniary loss; $200,000 for loss of companionship; and $750,000 for mental anguish. Theresa Thompson Field's loss was valued by the jury as $50,000 for pecuniary loss; $200,000 for loss of companionship; and $250,000 for mental anguish.

The damages found by the jury totaled $8.2 million; in addition, funeral expenses were stipulated to be $5,720.35. Total damages were $8,205,720.35. The trial court then deducted $6 million for the payments made in settlement by Shell, C & H, Webber, and Pratt. The amount of damages in the judgment was $2,205,720.35 to which prejudgment interest of $884,073.43 was added. The prejudgment interest included amounts accrued beginning on May 18, 1988. The total judgment to the Thompsons was $3,089,793.73.

Based on the jury's allocation of causation, the trial court allocated liability; C & H and Webber were liable for 50/85 of the total judgment; Ecotech was liable for 30/85 of the total judgment; and Energy Coatings was liable for 5/85 of the total judgment. In addition, C & H, Webber, and Ecotech were jointly and severally liable for the total judgment. C & H and Webber were given a right of contribution against Ecotech, and C & H, Webber, and Ecotech were given a right of contribution against Energy Coatings.

### ECOTECH'S NEGLIGENCE

In its first point of error, Ecotech contends that the trial court erred in entering judgment against Ecotech because there exists no duty by Ecotech to the Thompsons that could form the basis of a cause of action.

The Thompsons base their claims against Ecotech on negligence. In any cause of action for negligence, the plaintiff must show a legal duty owed by the defendant to the plaintiff. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987); *Abalos v. Oil Dev. Co.,* 544 S.W.2d 627, 631 (Tex.1976).

The concept of duty has expanded in recent cases. The foremost consideration is foreseeability of the risk. *El Chico,* 732 S.W.2d at 311; *see also Bennett v. Span Indust., Inc.,* 628 S.W.2d 470, 473 (Tex. App.—Texarkana 1981, writ ref'd n.r.e.) (the concept of duty has expanded to the point that often the mere knowledge of a risk of harm to another, which may be avoided with little inconvenience, imposes a duty of care). Thus, even in the absence of privity or a legal relationship, if a reasonable person would recognize that his conduct poses a risk of harm to another, he should exercise ordinary care in his conduct to avoid that harm. *Eimann v. Soldier of Fortune Magazine, Inc.,* 680 F.Supp. 863, 866 (S.D.Tex.1988); *Bennett,* 628 S.W.2d at 474. Thus, a duty arises when a person's conduct poses a foreseeable risk to another that could be avoided by the exercise of ordinary care.

In arguing that Ecotech owed no duty to the Thompsons, Ecotech attempts to distinguish *Seay v. Travelers Indem. Co.,* 730 S.W.2d 774 (Tex.App.—Dallas 1987, no writ), from the present case. In *Seay,* a maintenance worker at a hospital died as a result of injuries he received when a safety relief valve on a boiler discharged scalding water. *Id.* at 775. Employees of Travelers had inspected the boilers at the hospital for several years and had given them favorable reviews. *Id.* The trial court granted summary judgment in that case finding that, as a matter of law, no duty existed on the part of Travelers as to the maintenance worker. *Id.*

The Dallas Court of Appeals found that the RESTATEMENT (SECOND) OF TORTS § 324A (1977) describes the scope of the duty, under Texas law, owed by one undertaking a task necessary for the protection of a third party. *Seay,* 730 S.W.2d at 777. The Restatement provides:

> One who undertakes . . . to render services to another which he should recognize as necessary for the protection of a third person . . . is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

RESTATEMENT (SECOND) OF TORTS § 324A. The court found the summary judgment evidence failed to show there was no issue of fact concerning whether Travelers undertook to perform a duty owed by the hospital to the maintenance worker, or concerning whether the hospital or the maintenance worker relied on Travelers' performance. *Seay,* 730 S.W.2d at 779–80.

In *Seay,* the court decided whether a motion for summary judgment was properly granted; thus, the court decided that an issue of fact, which should have been submitted to the jury, existed on Travelers' duty to the maintenance worker; the court did not decide that Travelers owed a duty to the maintenance worker. However, the

underlying facts in *Seay* are analogous to the underlying facts in the present case. Moreover, the Dallas Court of Appeals recognized that one who seeks to perform a duty to another owes a duty of reasonable care to third persons at risk from performance of that duty. In the present case, Jerry Thompson was a third person at risk from Ecotech's failure to exercise reasonable care in performance of its duty to Shell.

Ecotech was hired by Shell to, among other things, supervise the loading of the pipe to ensure the pipe was not damaged. It was foreseeable by Ecotech that Shell and others associated in loading the pipe would rely on Ecotech to determine that the pipe was safely secured. If the pipe was not safely secured, Ecotech could foresee that the pipe might come off the trailer, which would damage the pipe. Ecotech could also foresee that if the pipe was not safely secured, the pipe might come off the trailer in transit and injure another motorist. Jerry Thompson was just such a motorist. Ecotech could foresee that its conduct in supervising the loading of the pipe could create a risk of harm to another and that the risk of harm could be avoided by exercising ordinary care in its conduct. Thus, Jerry Thompson was within the scope of Ecotech's duty to exercise ordinary care in supervising the loading of the pipe.

We overrule Ecotech's first point of error.

In its second and third points of error, Ecotech contends that there is no evidence, or, at least, insufficient evidence, to support the finding of the jury that Ecotech was negligent and that Ecotech's negligence proximately caused the accident that killed Jerry Thompson.

In determining whether there is no evidence to support a jury finding, an appellate court should consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Sherman v. First Nat'l Bank*, 760 S.W.2d 240, 242 (Tex.1988); *Glockzin v. Rhea*, 760 S.W.2d 665, 666 (Tex.App.—Houston [1st Dist.]

1988, writ denied). If there is any evidence to support the jury finding, the appellate court must uphold the finding. *Sherman*, 760 S.W.2d at 242; *Glockzin*, 760 S.W.2d at 666.

In determining whether the evidence is sufficient to support a jury finding, the appellate court should consider and weigh all evidence before the jury. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986); *Glockzin*, 760 S.W.2d at 666. Only if the jury finding is so against the great weight and preponderance of the evidence as to be manifestly unjust should the appellate court set the finding aside. *Cain*, 709 S.W.2d at 176; *Glockzin*, 760 S.W.2d at 666. The appellate court cannot substitute its opinion for that of the trier of fact and determine that it would reach a different conclusion. *Glockzin*, 760 S.W.2d at 666.

Webber testified that he secured the pipe with the straps and that the straps appeared to be in good condition. Webber did not know the cause of the accident, but he was unaware of any problem until he noticed the load was shifting. Webber's testimony was corroborated by the testimony of Jerry Hoover, who also noticed the pipe shifting. Wade Wallace, the officer who investigated the accident, felt the straps had come loose on the pipe due to movement of the truck.

The evidence shows that Calvin Barr, an employee of Ecotech, monitored the loading of the pipe; moreover, by his own admission, Barr had no experience, training, or instruction on the proper way to safely secure the pipe. The evidence also shows that the pipe was secured by six straps. Dr. Gary Nelson, the Thompsons' expert, testified that the straps and the chocks used to secure the load were inadequate. In Nelson's opinion, the pipe came off the trailer due to failure of a chock or of a strap or due to road dynamics.

On the other hand, Robert Bell, Ecotech's expert, testified that the straps used to secure the load were more than adequate. Lee Carr, Energy Coatings's expert, stated there were two possible causes of the accident. One of the possibilities was that the straps used were not good and

there was something wrong with the trailer. However, Carr's final conclusion was that the accident was caused by the truck hitting the median barrier.

Therefore, the jury's findings that Ecotech was negligent in the performance of its duty and that Ecotech's negligence was the proximate cause of Jerry Thompson's death were not so against the great weight and preponderance of the evidence as to be manifestly unjust. We find the evidence was sufficient to support the jury's findings that Ecotech was negligent and that Ecotech's negligence was the proximate cause of the accident. Since the evidence is sufficient to support the jury's findings, there is some evidence to support the findings.

We overrule Ecotech's second and third points of error.

### HEARSAY

In its point of error four, Ecotech contends that the trial court erred in admitting into evidence, over a hearsay objection, the prior consistent written statements of Jerry Hoover. Ecotech contends that the error of the trial court was a denial of Ecotech's rights that probably caused rendition of an improper judgment.

During his deposition testimony, Hoover identified two exhibits as true and correct copies of an affidavit and a written statement previously prepared and signed by him. After Hoover's deposition testimony was read into evidence, C & H and Webber offered the exhibits into evidence. Ecotech objected on the basis that the exhibits were hearsay. The trial court overruled the objection and admitted the exhibits into evidence.

The exhibits were statements, other than ones made by Hoover while testifying, offered in evidence to prove the truth of the matter asserted. The exhibits were clearly hearsay. TEX.R.CIV.EVID. 801(d). We find the trial court erred in overruling Ecotech's objection and admitting the exhibits into evidence.

We now determine whether the trial court's error was harmful. See TEX.R.

APP.P. 81(b)(1) (no judgment shall be reversed on appeal unless the appellate court finds the error committed by the trial court was reasonably calculated to cause and probably did cause rendition of an improper judgment).

During cross-examination, Wade Wallace stated that he had examined the exhibits when his deposition was taken. Wallace asserted that the exhibits confirmed his opinion, that Webber truck did not strike the median barrier, because Hoover stated in both exhibits that the truck did not strike the barrier. Ecotech did not object to Wallace's testimony. C & H and Webber then offered the exhibits into evidence for the limited purpose of showing the basis of Wallace's opinion. Ecotech objected claiming the exhibits were inadmissible hearsay. However, the trial court admitted the exhibits for the limited purpose. The trial court did not give, nor did Ecotech request, an instruction in the charge limiting the use of the exhibits. On appeal, Ecotech does not contend that the exhibits were not admissible for the limited purpose.

We find the trial court's error in admitting the exhibits was harmless. Wallace testified concerning the contents of the exhibits. Any error caused by the trial court improperly admitting evidence over objection is rendered harmless by the objecting party allowing the same or similar evidence to be introduced on another occasion without objection. *Badger v. Symon*, 661 S.W.2d 163, 164–65 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). Moreover, the exhibits were also before the jury for a limited purpose, but no limiting instruction was given or requested; therefore, we find no harm in the admission of the exhibits for all purposes. *See Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 642 (Tex.1987) (complaint that evidence was inadmissible was waived where it was admissible for only one purpose and opposing party failed to request a limiting instruction). Since the exhibits were already before the jury, and the evidence contained in the exhibits was elicited, without objection, from other testimony, we find the trial

court's error in admitting the exhibits into evidence was harmless.

We overrule Ecotech's fourth point of error.

## LETTER AGREEMENT

In its fifth point of error, Ecotech contends that the trial court erred in excluding from evidence a letter agreement between the Thompsons and C & H, Webber, and Pratt. Energy Coatings makes the same contention in its fifth cross-point of error.

The letter agreement states that the Thompsons were to receive payments totaling $3 million from C & H, Webber, and Pratt. In exchange for the payments, the Thompsons agreed to eliminate any claims for punitive damages against C & H, Webber, or Pratt and to limit their claims against C & H, Webber, and Pratt to $8.5 million. The Thompsons also agreed to indemnify C & H, Webber, and Pratt against any claims by the other defendants that resulted in liability in excess of $8.5 million. Furthermore, C & H, Webber, and Pratt were given the right to approve any settlement between the Thompsons and the remaining defendants. The letter agreement expressly states that C & H, Webber, and Pratt did not admit liability; rather, they continued to claim they were not legally liable for the accident.

At trial, Energy Coatings sought to have the letter agreement admitted into evidence. Energy Coatings claimed the letter agreement would show the interest and bias of C & H, Webber, and Pratt. The trial court denied the agreement admission.

Settlement agreements are generally not admissible in evidence. *General Motors Corp. v. Simmons*, 558 S.W.2d 855, 857 (Tex.1977); Tex.R.Civ.Evid. 408. Settlement agreements may be admissible for a purpose other than establishing liability; for example, settlement agreements may be admissible to show bias or interest of a party. Tex.R.Civ.Evid. 408. One kind of settlement agreements that are admissible are "Mary Carter" agreements. In a "Mary Carter" agreement, a codefendant settles with the plaintiff and obtains a financial stake in the plaintiff's recovery against the other defendants. *General Motors*, 558 S.W.2d at 857–58. "Mary Carter" agreements are admissible to show the true interest of the parties. *Id.* at 857–59. However, a settlement agreement is not a "Mary Carter" agreement if the codefendant does not receive a financial stake in the plaintiff's recovery against the other defendants. *See Miller v. Bock Laundry Mach. Co.*, 568 S.W.2d 648, 652 (Tex.1977) (since the settling defendant did not acquire a financial interest in the plaintiff's recovery against the other defendant, the agreement was not an admissible "Mary Carter" agreement).

The cases that Ecotech and Energy Coatings rely on to support their contention that the letter agreement should have been admitted into evidence are distinguishable from the present case. For example, they rely on *General Motors*, which involves a "Mary Carter" agreement. A settlement giving the settling defendant a 50% interest, up to a certain dollar limit, in any recovery by the plaintiff against the other defendant should have been disclosed to show the true alignment of the parties. *General Motors*, 558 S.W.2d at 857. Similarly, a settlement agreement that gave the settling defendant the right to be repaid the amount of his payment in settlement out of any recovery by the plaintiff from the other defendant should have been admitted to show bias. *Bristol–Myers Co. v. Gonzales*, 561 S.W.2d 801, 804–05 (Tex. 1978). Ecotech and Energy Coatings also rely on *City of Houston v. Sam P. Wallace & Co.*, 585 S.W.2d 669 (Tex.1979). A "Mary Carter" agreement was not involved in *City of Houston*, but the settling plaintiff admitted the true consideration for his settlement was that he would not argue against the settling defendant in closing argument. *Id.* at 672. The settlement agreement should have been revealed to the jury to show the true interests of the parties. *Id.* at 674. The cases relied on by Ecotech and Energy Coatings all involve agreements that shift the interests of the parties. In each case, it appeared that a settling party remained on one side of the

lawsuit, while his real interest was on the other side of the lawsuit. A settlement agreement is admissible to show real interest in a lawsuit.

On the other hand, settlement agreements that give the settling defendant no financial stake in the plaintiff's recovery, or that do not create a misalignment of parties are inadmissible. This Court held that a settlement agreement that did not change the financial interests of any of the parties was properly excluded from evidence. *Singleton v. Crown Cent. Petroleum Corp.*, 713 S.W.2d 115, 122–23 (Tex. App.—Houston [1st Dist.] 1985), *rev'd on other grounds*, 729 S.W.2d 690 (Tex.1987). The plaintiff settled with one codefendant and agreed to indemnify the codefendant for any amount recovered in a cross-action by the other codefendant. *Id.* at 122. This Court held that the settlement agreement did not change the financial interests of the parties; thus, the agreement was properly excluded from evidence. *Id.* at 122–23.

The Fourteenth Court of Appeals reached a similar conclusion in *Turner v. Monsanto Co.*, 717 S.W.2d 378 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). A settlement agreement between two codefendants was properly excluded from evidence. *Id.* at 381. In the agreement, one codefendant agreed to pay 30% of any judgment entered against the other codefendant up to $500,000. *Id.* at 380. The court held that the agreement did not change the interest of the parties; the agreement merely altered the share of potential liability each codefendant was facing. *Id.* at 380–81. Since the agreement did not create a misalignment of parties, it was properly excluded from evidence. *Id.* at 381.

The letter agreement between the Thompsons and C & H, Webber, and Pratt did not shift the interests of the parties. C & H, Webber, and Pratt remained defendants both in form and in real interest. C & H, Webber, and Pratt were not given any financial stake in any recovery by the Thompsons against the other defendants. Furthermore, there is no indication that the consideration, either in full or in part, for

the letter agreement was that C & H, Webber, and Pratt would assist the Thompsons in establishing liability against the other defendants. The letter agreement expressly states that C & H, Webber, and Pratt continued to deny liability. While C & H, Webber, and Pratt did make payments of $3 million to the Thompsons before trial, C & H, Webber, and Pratt were still exposed to additional liability at trial. The agreement only limited the Thompsons' claims against C & H, Webber, and Pratt to $8.5 million actual damages and no punitive damages; the Thompsons were not precluded from seeking damages from C & H, Webber, and Pratt. In fact, C & H and Webber were ultimately found to be liable for 50/85 of the entire judgment. Since the letter agreement in the present case did not give the settling defendants a financial stake in any eventual recovery by the plaintiffs against the other defendants, nor did it create a misalignment of parties, the letter agreement was not admissible. The trial court did not err in excluding the letter agreement from evidence.

We overrule Ecotech's fifth point of error and Energy Coatings's fifth cross-point of error.

## DAMAGES

### Loss of Inheritance Damages

 Ecotech contends, in its sixth point of error, that there is no evidence, or, at least, insufficient evidence, to support the finding of the jury that Linda Thompson sustained a $200,000 loss of inheritance. C & H and Webber make the same contention in their fifth point of error, as does Energy Coatings in its fourth cross-point of error.

In determining whether there is no evidence to support a jury finding, an appellate court should consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Sherman*, 760 S.W.2d at 242; *Glockzin*, 760 S.W.2d at 666. If there is any evidence to support the jury finding, the appellate court must uphold the finding. *Sherman*, 760 S.W.2d at 242; *Glockzin*, 760 S.W.2d at 666.

In determining whether the evidence is sufficient to support a jury finding, the appellate court should consider and weigh all evidence before the jury. *Cain,* 709 S.W.2d at 176; *Glockzin,* 760 S.W.2d at 666. Only if the jury finding is so against the great weight and preponderance of the evidence as to be manifestly unjust should the appellate court set the finding aside. *Cain,* 709 S.W.2d at 176; *Glockzin,* 760 S.W.2d at 666. An appellate court cannot substitute its opinion for that of the trier of fact and determine that it would reach a different conclusion. *Glockzin,* 760 S.W.2d at 666.

Dr. Allen, the Thompsons' economist, testified as to loss of inheritance. Allen valued Jerry Thompson's earning capacity at $1,393,475 and his projected personal consumption at $379,752. From these figures, Allen determined the undiscounted loss from Jerry Thompsons's death was $1,013,-723. Discounted to present value, Allen valued the loss at $958,363. Linda Thompson testified that Jerry was practical with money and saved for the future. Both Linda Thompson and close friends, Alvis and Jan Moss, testified that Jerry Thompson was very close to his wife and their children. Linda Thompson stated that Jerry Thompson was 48 years old at the time of his death, and he was in good health.

Loss of inheritance damages are defined, in Texas, as "the present value that the deceased, in reasonable probability, would have added to the estate and left at natural death to the statutory wrongful death beneficiaries but for the wrongful act causing the premature death." *Yowell v. Piper Aircraft Corp.,* 703 S.W.2d 630, 633 (Tex. 1986). While some wrongful death beneficiaries can recover loss of inheritance damages, not every wrongful death beneficiary sustains loss of inheritance damages. *Id.* If the decedent would have earned no more than his family would have used for its support, or if the decedent would have outlived the wrongful death beneficiary, loss of inheritance damages can properly be denied. *Id.* The issue is for the jury to decide. *Id.*

In *Yowell,* the Texas Supreme Court found there was some evidence to support loss of inheritance damages. *Yowell,* 703 S.W.2d at 634. The court found evidence of salaries, expected raises and promotions, earning capacity, enforced savings, spending habits, age, health, and relationship with the beneficiaries was some evidence to support a finding of loss of inheritance damages. *Id.* Similarly, the San Antonio Court of Appeals found there was some evidence to support the jury's findings of loss of inheritance damages. *Lopez v. City Towing Assoc., Inc.,* 754 S.W.2d 254, 265 (Tex.App.—San Antonio 1988, writ denied). The court found evidence of the past jobs the decedent had held, her aspirations, the past use of the money she had earned, and her relationship with her family was some evidence of loss of inheritance damages. *Id.*

In the present case, an economist testified as to the value of Jerry Thompsons' earning capacity, made a deduction for the amount Jerry Thompson would have spent on personal consumption, and valued the loss from Jerry Thompsons' death, discounted to present value. In addition, Linda Thompson and family friends testified as to the close relationship between Jerry Thompson and his family. Linda Thompson also testified that Jerry Thompson saved money for the future. He was 48 years old when he died and was in good health. The jury's finding awarding loss of inheritance damages is not so against the great weight and preponderance of the evidence as to be manifestly unjust. We find the evidence sufficient to support the jury finding awarding loss of inheritance damages to Linda Thompson. Since the evidence is sufficient to support the jury finding, there is some evidence to support the finding.

We overrule Ecotech's sixth point of error, C & H and Webber's fifth point of error, and Energy Coating's fourth cross-point of error.

*Settlement Credit*

 C & H and Webber contend in their first point of error, and the Thompsons contend in their second cross-point of

error, that the trial court erred in crediting all of the defendants with voluntary payments of $3 million made before trial to the Thompsons by C & H, Webber, and Pratt. Specifically, C & H, Webber, and the Thompsons contend that the payments did not result in a full settlement of the Thompsons' claims against C & H, Webber, and Pratt, and the payments should have only been credited to C & H and Webber.

The Thompsons and C & H, Webber, and Pratt entered a letter agreement before trial. C & H, Webber, and Pratt agreed to make payments to the Thompsons totaling $3 million; $100,000 was paid on May 6, 1988; $900,000 was paid on January 25, 1989; $1 million was paid on February 13, 1989; and $1 million was paid on February 17, 1989. In exchange for the payments, the Thompsons agreed, among other things, to eliminate any claims for punitive damages against C & H, Webber, and Pratt and to limit their claims against C & H, Webber, and Pratt to $8.5 million. However, the letter agreement expressly states that C & H, Webber, and Pratt did not admit liability; rather, they continued to claim they were not legally liable for the accident.

Pursuant to Tex.Civ.Prac. & Rem.Code Ann. § 33.014 (Vernon Supp.1991), Ecotech, Energy Coatings, C & H, and Webber made a written election to accept a credit equal to the sum of the dollar amount of all settlements. The Civil Practice and Remedies Codes provides:

> If a claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a credit equal to ... (1) the sum of the dollar amount of all settlements.

Tex.Civ.Prac. & Rem.Code Ann. § 33.012(b) (Vernon Supp.1991).

A settling person is defined as "a person who at the time of submission has paid or promised to pay money ... to a claimant at any time in consideration of potential liability ... with respect to the ... death for which recovery of damages is sought." Tex.Civ.Prac. & Rem.Code Ann. § 33.011(5) (Vernon Supp.1991). No defendant can have a right of contribution against a settling person. Tex.Civ.Prac. & Rem.Code Ann. § 33.015(d) (Vernon Supp.1991). However, each defendant who is jointly and severally liable is given a right of contribution against each other "liable defendant." Tex.Civ.Prac. & Rem.Code Ann. § 33.015(a) (Vernon Supp.1991). A "liable defendant" is defined as "a defendant against whom a judgment can be entered for at least a portion of the damages awarded to the claimant." Tex.Civ.Prac. & Rem.Code Ann. § 33.011(3) (Vernon Supp.1991). C & H and Webber argue that "settling person" and "liable defendant" must be interpreted as mutually exclusive terms to avoid an irreconcilable conflict between sections 33.-015(a) and (d).

It is the duty of this Court to construe a statute as written and ascertain the legislature's intent from the language of the act. *Morrison v. Chan*, 699 S.W.2d 205, 208 (Tex.1985). In determining legislative intent, we must look to the entire statute, not just to one clause or section. *Barr v. Bernhard*, 562 S.W.2d 844, 849 (Tex.1978). One provision will not be given a meaning inconsistent with any other provision. *Id.* However, this Court will not strain the language of a statute to find an inconsistency between provisions.

Section 33.015(a) provides that a defendant who is jointly and severally liable has a right of contribution against other liable defendants. On the other hand, section 33.015(d) provides that no defendant can have a right of contribution against a settling person. If a person is both a liable defendant and a settling person, no defendant may have a right of contribution against him. No conflict exists between the two sections. "Settling person" and "liable defendant" do not have to be interpreted as mutually exclusive terms. Therefore, a person can be both a settling person and a liable defendant.

C & H and Webber were just such a parties. C & H and Webber were liable defendants because they were defendants against whom at least a portion of the damages could be assessed. In addition, C

& H and Webber were settling persons because they were persons who, at the time of submission, had paid to the claimants money in consideration of potential liability. At the time of the trial, C & H and Webber had paid the Thompsons $3 million in consideration of no exposure for punitive damages and exposure for actual damages limited to $8.5 million. Therefore, C & H and Webber were settling persons.

The court properly credited the entire judgment with the $3 million payments that C & H, Webber, and Pratt had made to the Thompsons before trial. We overrule C & H and Webber's first point of error and the Thompsons' second cross-point of error.

*Apportionment of Damages*

▮ In their second point of error, C & H and Webber contend, among other things, that the trial court erred in its apportionment of damages for the purpose of calculating rights of contribution. Specifically, C & H and Webber contend that they should have only been liable for 50/80 of the judgment and Ecotech should have been liable for 30/80 of the judgment. In its first cross-point of error, Energy Coatings contends that the trial court erred in finding Energy Coatings liable for 5/85 of the damages recoverable by the Thompsons; Energy Coatings contends that it should have been found liable for 5/100 of the damages.

The Civil Practice and Remedies Code provides:

> If the claimant has settled with one or more persons, the court shall further reduce the amount of damages to be recovered by the claimant with respect to a cause of action by a credit equal to ...
> (1) the sum of the dollar amounts of all settlements.

TEX.CIV.PRAC. & REM.CODE ANN. § 33.012(b). Therefore, the trial court properly reduced the damages awarded by the jury by the $6 million paid to the Thompsons in settlements. The amount of damages recoverable by the Thompsons is $2,205,720.35.

Energy Coatings' contention that it is liable for 5/100 of the damages recoverable by the Thompsons is contrary to the language of the statute. Similarly, C & H and

Webber's contention that, as among C & H, Webber, and Ecotech, C & H and Webber are liable for 50/80 of the damages recoverable by the Thompsons, and Ecotech is liable for 30/80 of the damages recoverable by the Thompsons is contrary to the language of the statute.

A defendant is liable for the percentage of damages equal to that defendant's "percentage of responsibility." TEX.CIV.PRAC. & REM.CODE ANN. § 33.013(a) (Vernon Supp. 1991). Furthermore, each defendant who is jointly and severally liable is liable for the damages recoverable by the claimant in proportion to his respective "percentage of responsibility." TEX.CIV.PRAC. & REM.CODE ANN. § 33.015(b) (Vernon Supp.1991). "Percentage of responsibility" is defined as "that percentage attributed by the trier of fact to each ... defendant." TEX.CIV.PRAC. & REM.CODE ANN. § 33.011(4) (Vernon Supp. 1991). In the present case, the jury attributed 50% of the responsibility to C & H and Webber, 30% of the responsibility to Ecotech, and 5% of the responsibility to Energy Coatings. Shell's percentage of responsibility was 15%. Since the payments in settlement were deducted by the trial court in reducing the damages awarded by the jury from $8,205,702.35 to $2,205,702.35, the 15% responsibility attributed to Shell cannot be deducted a second time. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 33.012(c) (Vernon Supp.1991) (the amount of damages recoverable by the claimant may only be reduced once by the credit for settlements). Therefore, C & H, Webber, Ecotech, and Energy Coatings must bear 100% of the liability for the $2,205,720.35 damages awarded to the Thompsons by the court.

According to the jury, C & H, Webber, Ecotech, and Energy Coatings shared 85% of the responsibility. Therefore, their share of liability for the damages is determined by using a fraction with a denominator of 85. Since C & H and Webber were found to have 50% of the responsibility, C & H and Webber are responsible for 50/85 of the damages. Similarly, since Ecotech was found to have 30% of the responsibility, Ecotech is responsible for 30/85 of the

damages. Finally, since Energy Coatings was found to have 5% of the responsibility, Energy Coatings is responsible for 5/85 of the damages.

Therefore, the trial court did not err in apportioning damages, nor did the trial court err in apportioning rights of contribution.

We overrule Energy Coatings's first cross-point of error and this portion of C & H and Webber's second point of error.

*Contribution*

In its ninth point of error, Ecotech contends that the trial court erred in denying it a right of contribution against C & H and Webber with whom it is jointly and severally liable for the amount of the judgment.

Ecotech, C & H, and Webber were held jointly and severally liable for the total judgment. At trial, Ecotech sought a right of contribution against C & H and Webber. While C & H and Webber were given a right of contribution against Ecotech, Ecotech was denied a right of contribution against C & H and Webber.

If a defendant in a wrongful death action is jointly and severally liable and pays a percentage of the damages greater than his percentage of liability, that defendant is entitled to a right of contribution as to the other liable defendant who did not pay his percentage of responsibility. TEX.CIV.PRAC. & REM.CODE ANN. § 33.015(a). A defendant who is jointly and severally liable for a judgment should be granted a right of contribution against any other defendant with whom it is jointly and severally liable. TEX. CIV.PRAC. & REM.CODE ANN. § 33.015(b). However, no defendant may have a right of contribution against a settling person. TEX.CIV.PRAC. & REM.CODE ANN. § 33.015(d). As discussed above, C & H and Webber were settling persons. Therefore, Ecotech could not be granted a right of contribution against C & H and Webber. The trial court did not err in denying Ecotech a right of contribution against C & H and Webber.

We overrule Ecotech's ninth point of error.

In their second point of error, C & H and Webber contend, among other things, that any payments made by Energy Coatings should reduce the total joint and several liability of C & H, Webber, and Ecotech, and that C & H, Webber, and Ecotech are entitled to a right of contribution against Energy Coatings, limited to 5% of the total damages awarded by the jury.

C & H, Webber, and Ecotech were granted a right of contribution against Energy Coatings. The right of contribution was limited to 5/85 of the damages recoverable by the Thompsons or the damages awarded in the judgment by the trial court.

C & H and Webber are correct that any payments made by Energy Coatings will reduce the total joint and several liability of C & H, Webber, and Ecotech. For example, before any payments, C & H, Webber, and Ecotech are jointly and severally liable for $2,205,720.35. If Energy Coatings makes a payment of $100,000, C & H, Webber, and Ecotech are jointly and severally liable for $2,105,720.35. Any payment by Energy Coatings necessarily reduces the total joint and several liability of C & H, Webber, and Ecotech.

C & H and Webber also seek to increase the right of contribution against Energy Coatings from 5/85 of the damages in the judgment to 5/100 of the damages awarded by the jury. C & H and Webber rely on the language of the Civil Practice and Remedies Code to support its argument. The Civil Practice and Remedies Code provides:

> If a defendant who is jointly and severally liable ... pays a percentage of the damages ... greater than his responsibility, that defendant has a right of contribution for the overpayment against each other liable defendant to the extent that the other defendant has not paid *the percentage of the damages found by the trier of fact equal to that other defendant's percentage of responsibility.*

TEX.CIV.PRAC. & REM.CODE ANN. § 33.015(a) (emphasis added). C & H and Webber contend that the language of the statute should be interpreted to mean that a jointly and severally liable defendant's right of contribution against another defendant should be equal to the defendant's percentage of the damages awarded by the jury.

If the construction of the statute urged by C & H and Webber were adopted, C & H, Webber, and Ecotech would have a right of contribution against Energy Coatings for an amount $280,537.76 in excess of Energy Coatings' liability to the Thompsons. As previously discussed, Energy Coatings is liable for 5/85 of the judgment or $129,748.26. C & H and Webber urge that C & H, Webber, and Ecotech should have a right of contribution against Energy Coatings for 5/100 of the $8,205,720.35 damages found by the jury or $410,286.02. C & H, Webber, and Ecotech should not be allowed a right of contribution greater than Energy Coatings' liability to the Thompsons.

This Court will not adopt a construction of a statute that leads to an unreasonable result. *See, e.g., Young v. Del Mar Homes, Inc.,* 608 S.W.2d 804, 807 (Tex.Civ. App.—Houston [14th Dist.] 1980, writ ref'd n.r.e.) (the court will not adopt a construction of a statute that rests on an assumption that the legislature intended to do unreasonable things). Therefore, we interpret section 33.015(a) to mean that a jointly and severally liable defendant has a right of contribution against another liable defendant in the amount of the other defendant's percentage of responsibility, which was found by the jury, for the damages recoverable by the plaintiff.

The trial court properly granted C & H, Webber, and Ecotech a right of contribution against Energy Coatings for 5/85 of the judgment. We overrule all of C & H and Webber's second point of error (including that previously overruled).

*Prejudgment Interest*

■ In its seventh point of error, Ecotech contends that the trial court erred in its calculation of prejudgment interest. Specifically, Ecotech contends that the trial court erred in applying the rate of interest to the amount of damages awarded by the jury, rather than the amount of damages awarded in the final judgment. C & H and Webber make the same contention in their third point of error, as does Energy Coatings in its second cross-point of error.

Judgments in wrongful death cases must include prejudgment interest. TEX.REV.CIV. STAT.ANN. art. 5069–1.05, § 6(a) (Vernon Supp.1991). Prejudgment interest accrues on the amount of the judgment. TEX.REV. CIV.STAT.ANN. art. 5069–1.05, § 6(a). A judgment is rendered by the court after the trier of fact returns its verdict or conclusions of fact. *See, e.g.,* TEX.R.CIV.P. 300 (the court shall render judgment on a special verdict or conclusions of fact). Prejudgment interest accrues on the judgment rendered by the court, not on the verdict returned by the jury.

From the language of the judgment, it does appear that the trial court applied prejudgment interest to an amount that included amounts paid in settlement; that is, the trial court applied prejudgment interest to the damages awarded by the jury rather than the damages awarded in the judgment, which had been reduced by a credit for payments made in settlement. The trial court erred in applying the rate of interest to the amount of damages found by the jury. The trial court should have applied the rate of interest to the amount of damages in its judgment after deducting the amount of payments made in settlement from the amount of damages found by the jury.

We sustain Ecotech's seventh point of error, C & H and Webber's third point of error, and Energy Coatings's second cross-point of error.

■ Ecotech, in its eighth point of error, C & H and Webber, in their fourth point of error, and Energy Coatings, in its third cross-point of error, contend that the trial court erred in awarding the Thompsons prejudgment interest on damages that were either future damages or unsegregated past and future damages.

The damages awarded included pain and mental anguish suffered by Jerry Thompson, pecuniary loss, loss of companionship, and mental anguish suffered by Linda and Troy Thompson and Theresa Thompson Fields, and loss of inheritance suffered by Linda Thompson. The damages awarded for the pain and mental anguish suffered by Jerry Thompson included no element of

future damages. However, the damages awarded for pecuniary loss, loss of companionship, mental anguish, and loss of inheritance included unsegregated past and future damages. The jury was told to make an award for "damages ... that were sustained in the past and that in reasonable probability will be sustained in the future." Prejudgment interest was applied to all of these amounts.

The Texas Supreme Court held that prejudgment interest cannot be recovered on future damages, and a plaintiff who failed to segregate past and future damages cannot recover prejudgment interest on the unsegregated amounts. *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 556 (Tex.1985). However, *Cavnar* was decided prior to the enactment of tort reform legislation in Texas. The legislature amended TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 6 (Vernon Supp.1991), in 1987. Section 6 became effective on September 2, 1987, and applies to all actions commenced on or after September 2, 1987. TEX.REV. CIV.STAT.ANN. art. 5069–1.05 comment (Vernon Supp.1991). The present lawsuit was commenced on November 20, 1987. Thus, amended article 5069–1.05, section 6 controls the present case, not *Cavnar*.

Section 6 provides:

Judgments in wrongful death ... cases must include prejudgment interest.... [P]rejudgment interest accrues on the amount of the judgment....

TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 6(a). The language of the statute makes no distinction between damages awarded in the judgment for past damages and damages awarded for future damages. Moreover, John T. Montford, the principal author of the Senate tort reform package, states that the new prejudgment interest law, codified at TEX.REV.CIV.STAT.ANN. art. 5069–1.05, § 6, expands prejudgment interest to future damages included in the judgment. Barber & Montford, *1987 Texas Tort Reform: The Quest for a Fairer and More Predictable Texas Civil Justice System*, 25 HOUS.L.REV. 59, 102–103 (1988). We conclude that the law in Texas now allows recovery, in wrongful death cases,

of prejudgment interest on future damages. Therefore, the trial court did not err in awarding prejudgment interest on damages that included unsegregated past and future damages.

We overrule Ecotech's eighth point of error, C & H and Webber's fourth point of error, and Energy Coatings's third cross-point of error.

In their first cross-point of error, the Thompsons contend that the trial court erred in calculating prejudgment interest beginning on May 18, 1988, 180 days after the suit was filed, rather than November 20, 1987, the day suit was filed.

The Thompsons failed to raise this issue in the trial court. No motion to modify the judgment was filed on behalf of the Thompsons; in addition, the Thompsons' motion in opposition to defendants' motion to modify final judgment does not mention the issue. In order to preserve an issue for complaint on appeal, a party must have presented to the trial court a timely request, objection, or motion. TEX.R.APP.P. 52(a). The Thompsons failed to present to the trial court any request, objection, or motion regarding the date of commencement of prejudgment interest. Thus, the Thompsons have failed to preserve the issue for review on appeal.

We overrule the Thompsons' first cross-point of error.

In view of the disposition of the other points and cross-points of error, we do not address Energy Coatings' sixth and seventh-cross points of error.

We reverse the judgment, to provide that prejudgment interest be assessed on the amount of damages awarded in the judgment ($2,205,720.35), rather than on the amount of damages awarded by the jury, and remand to the trial court to determine the amount of such prejudgment interest. We affirm the remainder of the judgment.