*508
 
 OPINION ON MOTION FOR REHEARING
 

 ELLIS, Justice.
 

 After granting appellees’ motion for rehearing in part, we withdraw our opinion on original submission and substitute the following. Appellants’ motion for rehearing is denied.
 

 Appellants, Missouri Pacific Railroad Company d/b/a Union Pacific Railroad Company (MoPac) and its engineer, Raymond Douglas Johnson (Johnson), are appealing from a judgment assessing $2,218,018.28 in actual damages and $10,000,000 in exemplary damages in favor of Dewey Lemon, individually, and as Next Friend of Alfred DeJuan Franklin, a minor, and Charles A Richard and Ruby L. Warren as Representatives of the Estate of Sharon Elaine Lemon, appellees. MoPac and Johnson allege error in the trial court, and set out their points of error under the four specific headings of liability, contributory negligence, exemplary damages and admission of evidence. They raise approximately forty-two points of error under these headings, although it is difficult to determine because many of these points are multifarious and repetitious. We affirm as modified.
 

 On the night of December 13, 1989, a freight train operated by MoPac and driven by Johnson struck and killed Sharon Elaine Lemon at the Martin Luther King (MLK) railroad crossing in Sweeny, Texas. The MLK crossing had no signals, flashing lights, gates, or flagmen despite numerous complaints seeking better warning devices and/or improved safety at the crossing. Specifically, Sweeny residents complained railroad cars which were illegally and improperly parked obstructed the vision of drivers attempting to cross the tracks.
 

 The jury determined the collision was proximately caused by (1) Johnson’s negligence in failing to keep a proper lookout, operating the train at an excessive rate of speed, and failing to sound the train’s horn and bell, and (2) MoPac’s negligence through its employees in failing to keep a proper lookout and improperly parking railroad cars near the MLK crossing. The jury then determined the MLK crossing was “extra-hazardous,” and the collision was proximately caused by MoPac’s negligence in failing to provide automatic signals or a flagman at the MLK crossing. The jury found MoPac was grossly negligent and this negligence was committed with malice. Based on these findings, the jury awarded actual damages against MoPac and Johnson, and exemplary damages against MoPac.
 

 GROUP ONE POINTS OF ERROR LIABILITY
 

 Under Group One, appellants raise what appear to be thirteen points of error. Their argument makes it clear they are complaining generally about the submission of jury questions one, two, three and four. Additionally, they contend jury questions one, three and four are defective on the basis that “operating the train at an excessive speed” and “failure to install active warning devices” are both grounds of liability pre-empted by federal law. Further, appellants complain the evidence is legally and factually insufficient to support the jury’s finding of failure to keep a proper lookout under questions one and two.
 

 Appellants allege appellees “embarked on a risky gambit” in submitting questions which: required the jury to consider disparate groups of factual negligence theories in reaching an answer; conditioned exemplary damages upon the answers to the preceding jury questions regarding liability; and did not require the jury to specify each factual theory it found to be negligent. Such allegations are not well founded. The trial court has no discretion to submit separate questions as to each element or ground of recovery under a cause of action, and separate findings by the jury are not required. Texas
 
 Dept, of Mental Health and Mental Retardation v. Petty,
 
 848 S.W.2d 680, 682 & n. 2 (Tex.1992);
 
 Texas Dept, of Human Servs. v. E.B.,
 
 802 S.W.2d 647, 649 (Tex.1990). The rule is now well-settled in Texas that “broad-form submission ‘shall’ be used “whenever feasible.’ ”
 
 Texas Dept, of Human Servs.,
 
 802 S.W.2d at 649 (Tex.1990) (quoting Tex.R.Civ.P. 277). The phrase “whenever feasible” means “in any or every
 
 *509
 
 instance in which it is capable of being accomplished.”
 
 Id.
 

 The trial court is to submit to the jury the controlling questions in a case and this does not include asking “what specific ground or grounds ... the jury relied on to answer ... the questions posed.”
 
 Id.
 
 Thus, “[t]he fact that a jury question contains more than one factual predicate to support an affirmative answer to a controlling question, or more than one element of a cause of action, does not render it defective.” 4 Roy W. McDonald, Texas Civil PRActice in DistRict and County Courts § 22:6 (rev. 1992).
 

 In the present case, the trial court properly submitted the controlling questions regarding Johnson’s and MoPac’s negligence to the jury accompanied by appropriate instructions limiting the jury’s consideration to the specific acts of negligence pled. The trial court had no discretion to do otherwise.
 

 As to appellants’ other complaints we will begin with jury question one which asked: “Was the negligence, if any, of R.D. Johnson, a proximate cause of the collision in question?” Under this question the jury was instructed to “consider only the following acts of negligence, if any, by R.D. Johnson: (1) failure to keep a proper lookout, (2) operating the train at an excessive rate of speed, (3) failure to sound the train’s horn and bell.” Contrary to the implication in appellants’ brief that the jury was instructed to consider: act of negligence (1) regarding lookout, or act of negligence (2) regarding train speed,
 
 or
 
 act of negligence (3) regarding the train’s horn and bell, the jury was instructed to consider all three of these acts and only these three acts.
 
 [1]
 

 Appellants contend the jury should not have been instructed to consider act of negligence (2), operating the train at an excessive rate of speed, because this claim has been pre-empted by the Federal Railroad Safety Act (FRSA). They cite the recent United States Supreme Court opinion in
 
 CSX Transportation, Inc. v. Easterwood,
 
 — U.S.-, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) as support for this proposition. Based upon the specific facts of this case and the language of the
 
 Easterwood
 
 case, we disagree with their contention.
 

 In the
 
 Easterwood
 
 case, the Supreme Court found Mrs. Easterwood’s excessive train speed claim was pre-empted.
 
 Id.
 
 at -, 113 S.Ct. at 1742-43. However, the Court in a footnote specifically stated it was not addressing the FRSA’s preemptive effect on tort law duties such as the duty to slow or stop a train to avoid a specific, individual hazard.
 
 Id.
 
 at-n. 15, 113 S.Ct. at 1743 n. 15.
 

 In this case there was a line of tank cars improperly parked, in violation of Mo-Pac’s safety rules and section 5.620(b) of the Texas Administrative Code, within one hundred and five feet from the MLK crossing.
 
 See
 
 16 Tex.Admin.Code § 5.620(b) (West 1988) (Tex.R.R.Comm’n, Visual Obstructions at Public Grade Crossings). Johnson testified these tank cars obstructed his view of the intersection at MLK and the railroad tracks. He also indicated the tank ears obstructed his view of the southern approach to the MLK crossing, the side from which Sharon Lemon was approaching. Johnson testi-
 

 
 *510
 
 fied he would have seen Sharon Lemon’s car sooner if the tank ears had not been improperly set out on the track. Although he stated he was always concerned with grade crossings, Johnson testified it never occurred to him to slow his train down for the MLK crossing even after he realized his view of part of the crossing was obstructed. He stated he had made a slight, one to two mile an hour, reduction in speed after entering Sweeny because the signal block at the east end of Sweeny had gone from clear to dark, but the speed reduction was not prompted by, or related to, the parked tank cars. He testified he made no attempt to slow or stop the train until immediately prior to impact when he threw the train into emergency after Sharon Lemon’s car had pulled in front of the train.
 

 Johnson testified he had been going through this crossing ever since he started working for the railroad and he had 14 years experience as an engineer. He was aware his train could not stop on a dime in an emergency. He was also aware this crossing was very dark, i.e., unlit, was not protected by any device to warn an approaching motorist that a train was actually coming, contained multiple tracks, was elevated above the road level, and the road curved approaching the tracks from the south. The realization that his view of one side of the crossing was obstructed, coupled with his knowledge of this crossing, triggered a duty for Johnson to slow his train as he approached the MLK crossing. These illegally and improperly parked tank ears created a specific, individual hazard which required Johnson to continue to slow his train until he had a clear view of both sides of the intersection at MLK and the railroad tracks. His failure to slow the train under these conditions is evidence he was operating his train at an excessive rate of speed and is a claim that is not preempted by federal law. The improper parking of tank cars which obstruct the view of a crossing is not a hazard which the Secretary took into consideration when determining train speed limits under the FRSA.
 
 See Eastenuood,
 
 — U.S. at-, 118 S.Ct. at 1742, 1743. The trial court properly submitted appellees’ claim that Johnson was “operating the train at an excessive rate of speed” for the jury to consider.
 

 Appellants also contend there was legally and factually insufficient evidence to support the jury’s finding that Johnson failed to keep a proper lookout. When reviewing a complaint that the evidence is legally insufficient to support a finding, we will consider only the evidence and inferences which tend to support the jury’s finding, and disregard all contrary evidence and inferences.
 
 Best v. Ryan Auto Group, Inc.,
 
 786 S.W.2d 670, 671 (Tex.1990). After such a review, if we find any evidence of probative force to support the finding, then the finding must be upheld.
 
 Responsive Terminal Sys., Inc. v. Boy Scouts of Am.,
 
 774 S.W.2d 666, 668 (Tex.1989).
 
 See Southern States Transp., Inc. v. State,
 
 774 S.W.2d 639, 640 (Tex.1989). When there is a complaint that the evidence is factually insufficient to support the jury’s finding, we must review all of the evidence and determine if the weight of the record supports the finding.
 
 Plas-Tex, Inc. v. United States Steel Corp.,
 
 772 S.W.2d 442, 445 (Tex.1989);
 
 In re King’s Estate,
 
 150 Tex. 662, 664-65, 244 S.W.2d 660, 661 (1951). The jury is the sole judge of the credibility of the witnesses and the evidence, and is entitled to resolve any conflicts or inconsistencies in the evidence.
 
 See Benoit v. Wilson,
 
 150 Tex. 273, 239 S.W.2d 792 (Tex.1951);
 
 M.J. Sheridan & Son Co. v. Seminole Pipeline Co.,
 
 731 S.W.2d 620, 623 (Tex.App.—Houston [1st Dist.] 1987, no writ).
 

 On the issue of Johnson’s lookout, he testified generally he can see all the way down to the MLK crossing from the west end of Sweeny. Regarding the night of the accident, he stated “it was dark, so [he couldn’t] say exactly when” he saw the MLK crossing, but he knew where the crossing was and he did not see any obstruction or any kind of headlight on the crossing. However, he also testified he had been going through this crossing for at least 14 years. The evidence was uncontested that motorists approaching from the south have to negotiate a curve in the road in order to cross the tracks. Additionally, the evidence was uncontested that the railroad grade crossing was so elevated that a ear stopped on one side of the tracks
 
 *511
 
 cannot even see the roof of a car stopped on the other side. For a car’s headlights to be on the crossing, the car would have to have already negotiated the turn and the incline leading up to the tracks, and at least be to the first of the four sets of tracks. Thus, the lack of headlights on the crossing does not indicate there are not cars approaching the crossing.
 

 Johnson also indicated he was concentrate ing on the signal block at the east end of Sweeny, which had gone dark. He stated he had a lot of things on his mind such as making his initial one to two mile an hour reduction in speed in response to the signal change, commenting to M.R. Phillips (Phillips), the conductor, about the change in signal color, and watching with Phillips to see if the signal block changed back to clear or green. However, the tank cars blocking his vision were not a concern for his lookout. As he got closer to the intersection he stated that he noticed a car stopped on the north side of the crossing and Sharon Lemon’s car coming up on the south side of the crossing bringing to his attention that there were cars at the MLK crossing.
 

 On the night of the accident, Johnson told Mark Landrith (Landrith), Manager of Train Operations, he was five or six car lengths or approximately 300 to 350 feet back from the grade crossing when he first saw Sharon Lemon’s car. Johnson gave Landrith no information about where Sharon Lemon’s car was located when he first saw it. The evidence, however, established it would have been physically impossible for him to have seen her car from that distance away from the crossing because he would have had to be able to see through the improperly parked tank cars to see the south side of the crossing. When Johnson met with Deree Owens (Owens), the accident investigator for MoPac, he told her he was 150 feet back from the crossing when he first saw Sharon Lemon’s car, and her car was located near some bushes by the railroad crossbuek sign.
 

 Sometime after meeting with Owens, Johnson, accompanied by his lawyer, MoPac’s lawyer, Owens, Phillips and H.R. Wiley (Wiley), the brakeman, went out to the MLK crossing and walked off some distances. After this expedition, Johnson decided he was really about 200 feet back from the crossing when he first saw Sharon Lemon’s car, and her car was located just before the railroad crossbuck sign. Interestingly, Dr. Neilon J. Rowan, who reconstructed the accident for appellants, testified the location of Sharon Lemon’s car “just to the right of the cross-buck” would have been Johnson’s “first opportunity to see it” from the train. Additionally, Dr. Rowan’s calculations indicated that if Sharon Lemon’s car were located at the first possible location for Johnson to have seen it, Johnson would have been 207 feet back from the crossing when he first saw her car.
 

 Although Johnson testified Sharon Lemon’s ear was moving when he first saw it, he never stated that he kept his eye on the ear to see if it was going to stop. In fact, he stated his first indication that Sharon Lemon’s car was not going to stop was when the car pulled onto the tracks in front of the train immediately prior to impact. However, on the night of the accident, Johnson told Landrith Sharon Lemon’s ear never stopped, but slowed and then sped up across the tracks.
 

 In any ease, had Johnson begun slowing the train as soon as he realized his view or lookout was obstructed on the south side and continued to slow the train until his view on the south side was completely clear, Sharon Lemon would have had extra time to either see the train and stop, or proceed on across the tracks. The jury has the benefit of observing the demeanor of the witnesses and is free to believe any, all or none of a witness’ testimony. The evidence is sufficient to support the jury’s finding as to Johnson’s lookout.
 

 Next, we will consider jury question two which asked: “Was the negligence, if any, of Missouri Pacific Railroad, through its agents or employees, a proximate cause of the collision in question?” Under this question the jury was instructed to “consider only the following three acts of negligence if any: (1) failure to keep a proper lookout by M.R. Phillips; (2) failure to keep a proper lookout by H.R. Wiley; and (3) improper parking of the railroad cars near the MLK crossing.”
 

 
 *512
 
 Appellants’ only challenge to question two is that the evidence is legally and factually insufficient to support the jury’s finding as to the lookout by Phillips and Wiley.
 
 [2]
 
 Using the standards set out under jury question one, we will review the evidence for legal and factual sufficiency.
 

 Phillips was the conductor of the train which meant he was the boss of the crew. On the night of the accident he was sitting on the north side of the engine, approximately four feet from Johnson. He described his job as “[t]o be sitting there, being very alert of what was, you know, happening in front of me or all my surroundings.” He testified he was to “look and pay attention to what’s ... going on_” However, he testified he did not see Sharon Lemon’s car until it was struck by the train. He stated he first saw her “when she was hit and the fumes or whatever was coming up in front of the ... engine....” Although the conductor’s seat is equipped with a brake, Phillips stated he did not put the train into emergency because he did not need to use the emergency brake.
 

 He testified he did see the tank cars parked on the track and they did block his line of vision toward the south side of the crossing. He stated he could not see through the tank cars, and he could have seen more of the intersection and could have seen Sharon Lemon sooner if the tank cars had not been parked there. Phillips, like Johnson, was concentrating on the signal at the east end of Sweeny which had gone from clear to dark. He stated he and Johnson discussed the change in signal color and after that he was looking “to see was it going to turn back clear or what....”
 

 Additionally, Phillips stated he was “looking ahead ... at the crossing and on [his] side (the left or north side) and at the signal.” Unfortunately, Sharon Lemon’s car was approaching from Johnson’s side (the right or south side) of the train and not from Phillips’ side. He stated he could see to the right, straight ahead and to the left from his seat in the engine and did not indicate that anything, but the tank cars up to a certain point, blocked his view of the intersection. However, he still testified he did not see Sharon Lemon until the train hit her. Phillips from his testimony did not believe that if the train had slowed down Sharon Lemon would have had any extra time to see the train or get across the intersection.
 

 The jury heard other evidence that traveling at her estimated speed of 15 miles per hour, Sharon Lemon would have needed at most ten feet to stop. Even another quarter to one-half of a second in time could have made the difference between her life and death had the train slowed down.
 

 As to Wiley’s lookout, Wiley was not even certain where in the train he was located or whether he was “buckling up his pants” outside the bathroom just prior to the accident. On the night of the accident, he told Landrith that he was sitting on the lead engine when he first saw Sharon Lemon’s car and her car never stopped. At his deposition, he testified he was on the third engine because he had gone back there to use the restroom. He testified he was standing in the front of the third engine looking out of the right (south) side window buckling up his pants, and could see all the way to the intersection before he got there. He, like Johnson, stated he saw Sharon Lemon’s car as she was driving up the incline at the crossing and she started out going slow and then sped up. Wiley also stated he and Johnson talked about their testimony before having their depositions taken.
 

 Wiley, when asked about the tank cars, testified he remembered them being parked near the crossing. He testified the front of the engine he was in was beyond the last parked tank car on the track so that he could see through to the crossing. He then stated he first saw her “pretty much to the end of’ the last tank car and the part of the engine
 

 
 *513
 
 where he was standing was “pretty close to the end of the tank.” Then he thought the engine he was in was a little behind the end of the last tank car. He stated he saw Sharon Lemon’s car when it was located just past the crossbuck sign and followed it all the way across until it went in front of the train out of his sight.
 

 At trial, Wiley admitted that if the front of the third engine had been located, as he described in his deposition, where he could have seen the crossing and Sharon Lemon’s car, the lead engine would already have been through the MLK crossing. He admitted it would have been a physical impossibility for him to have seen Sharon Lemon’s car at the place where he testified it was located. Sometime between August 1990 and December 1990, he decided some of his deposition testimony was incorrect. He testified “it was a mistake” when he said at his deposition that he was in the third engine looking out the window when he first saw Sharon Lemon’s car. Therefore, he changed his testimony to state he was on the second engine and he was no longer buckling up his pants but was instead zipping up an insulated uniform. He was also mistaken in his deposition about where Sharon Lemon’s car was located when he first saw it. At trial, he testified her car was between the first and second set of tracks on the south side of the crossing. Additionally, he changed his mind about the view he had and stated the tank cars “obstructed [his] view in approaching the crossing.”
 

 The entire tenor of Wiley’s testimony was that he could not recall exactly what he told various people, he gave at least three different versions of events at varying times, and was generally “mistaken” about what he said. His deposition and trial testimony gave the impression he simply made up answers to questions and then if they were incorrect, or even if he thought they were incorrect, he would state he was mistaken and make up a new answer. His testimony leaves it unclear whether he was really keeping any kind of lookout.
 

 As discussed above, even a slight bit of extra time could have saved Sharon Lemon’s life. In order to slow or stop the train in response to a hazard, the crew would have to be keeping a'sufficient lookout to first perceive the hazard. There is ample evidence to support the jury’s affirmative answer to question two.
 

 We will now address jury question three which asked: “Was the MLK crossing an extra-hazardous crossing on the occasion in question?” Under this question the jury was instructed “[a] railroad crossing is ‘extra-hazardous’ when, because of surrounding conditions, it is so dangerous that persons using ordinary care cannot pass over it in safety without some warning other than the usual cross buck sign.”
 

 Appellants allege Texas’ extrahazardous common law is incompatible with the priority system established by the FRSA and is preempted. They cite Judge Birch’s concurring opinion in
 
 Mahony v. CSX Transportation, Inc.,
 
 966 F.2d 644 (11th Cir.1992) in support of this proposition. Judge Birch in his separate opinion criticized the
 
 Easterwood
 
 opinion, written by a different panel of the 11th Circuit, for failing to find that the FRSA preempted the state common law claim based on the absence of proper warning devices.
 
 Id.
 
 at 646-47. The United States Supreme Court, however, affirmed the
 
 Easterwood
 
 opinion defeating appellants’ argument on this point as will be discussed in more detail under jury question four below.
 
 See Easter-wood,
 
 — U.S. at —, 113 S.Ct. at 1736-42.
 

 Finally, we consider jury question four which asked: “Was the negligence, if any, of Missouri Pacific Railroad, through its agents or employees, a proximate cause of the collision in question?” Under this question the jury was instructed to “consider only the following acts of negligence, if any: (1) failure to provide automatic signals (such as gates, cantilevers, or flashing lights) or (2) failure to provide a flagman at the MLK crossing.”
 

 Appellants’ only complaint about jury question four is that the failure to provide automatic signals is pre-empted by federal law. The
 
 Easterwood
 
 opinion, which found Mrs. Easterwood’s signal claims were not preempted, controls our disposition of this complaint.
 
 See id.
 
 The Court in
 
 East
 
 
 *514
 

 erwood
 
 found the provisions of 23 CFR § 646.214(b)(3) and (4), “when applicable,” were the only potential sources of pre-emption which actually pre-empted state tort law on the issue of warning devices.
 
 Id.
 
 at-, 113 S.Ct. at 1740-41.
 
 See
 
 23 CFR § 646.-214(b)(3), (4) (1992).
 
 [3]
 
 These two regulations apply only to projects in which federal funds participate in the installation of warning devices.
 
 Easterwood,
 
 — U.S. at -, 113 S.Ct. at 1741. Warning devices are defined to include both active and passive warning devices, /d
 
 [4]
 

 The facts are undisputed in this case that the MLK crossing had only passive warning devices, i.e., a crossbuck sign and a yellow and black advanced warning sign. Thus, the only question which remains is whether federal funds participated in the installation of these warning devices at the MLK crossing, a precondition which must be met for either regulation. A review of the record reveals federal funds did not participate in the installation of these warning devices. The evidence indicates the MLK crossing ranked approximately 400 on the State’s funding index for the use of federal funds at railroad crossings and was nowhere near the cut-off point on the index to even be considered for federal funds.
 

 Additionally, Clifford Shoemaker (Shoemaker), the Director of Industry and Public Projects for MoPac’s parent company, Union Pacific Railroad, when asked specifically about what the railroad spent on warning devices at the MLK crossing, testified that “approximately every ten years you go out and spend a couple hundred dollars for a replacement sign plus labor.” Shoemaker was at trial on behalf of appellants to introduce evidence of the railroad’s safety efforts and the money it expended to protect the public at crossings, including the MLK crossing. Appellants now argue the record is not fully developed as to whether federal funds were used to install the warning devices at the MLK crossing. If indeed federal funds were used to install the warning devices at the MLK crossing then appellants have misled the jury with Shoemaker’s testimony. The reality about whether the railroad paid for these devices should have been investigated prior to putting Shoemaker on the stand to convey information that appellants now imply they were not even sure was correct. This lapse on appellants’ part does not require reversal for further development of the evidence. We will take Shoemaker at his word that the railroad paid for these warning devices at the MLK crossing. We find no preemption of appellees’ state common law claim regarding the absence of proper warning devices.
 

 Appellants’ points of error under Group One, regarding liability, are all overruled.
 

 GROUP TWO POINTS OF ERROR
 

 CONTRIBUTORY NEGLIGENCE
 

 Under Group Two, appellants raise four points of error. In point of error one, they complain the trial court erred in failing to submit excessive speed and failure to properly apply the brakes as grounds for Sharon Lemon’s contributory negligence. Appellants argue, in point of error two, the trial court erred by failing to submit their tendered instruction number four regarding the duty to reduce speed as required by statute under Tbx.Rev.Civ.Stat.Ann. art. 6701d, § 166(c) (Vernon 1977). Due to these erro
 
 *515
 
 neous omissions in the charge, appellants’ allege in point of error three they were denied the submission of a primary defensive theory raised by the evidence. Additionally, in point of error four they contend the jury’s answers to questions five and six, finding no contributory negligence on the part of Sharon Lemon, were against the great weight and preponderance of the evidence.
 

 The issue of contributory negligence was submitted to the jury in question five which asked: “Was the negligence, if any, of Sharon Elaine Lemon, a proximate cause of the collision in question?” Under this question the jury was instructed “consider only the following acts of negligence, if any: (1) failure to keep a proper lookout; and (2) failure to stop within fifty feet but not less than fifteen feet from the nearest rail.” Under question six the jury was asked to apportion the percentage of negligence attributable to each party. The jury found Johnson to be ten percent negligent, MoPac to be ninety percent negligent, and Sharon Lemon to be zero percent negligent.
 

 The trial court properly submitted the controlling question regarding Sharon Lemon’s contributory negligence under jury question five. The trial court has wide discretion in determining the proper instructions to accompany a jury question.
 
 Mobil Chem. Co. v. Bell,
 
 517 S.W.2d 245, 256 (Tex.1974);
 
 Harris v. Harris,
 
 765 S.W.2d 798, 801 (Tex. App.—Houston [14th Dist.] 1989, writ denied). Under broad form submission, “the extent of the jury’s consideration of the elements comprising the controlling issue becomes a matter of evidence and argument, subject to appropriate instruction of the [trial] court.”
 
 Members Mut. Ins. Co. v. Muckelroy,
 
 523 S.W.2d 77, 82 (Tex.Civ.App—Houston [1st Dist.] 1975, writ ref d n.r.e.). A review of the record reveals appellants presented evidence and argued that if Sharon Lemon “had been going slow enough, if she had stopped before crossing the crossing and looking, she would have seen, this accident would not have taken place.” We find the instructions complained of in point of error one, regarding the claims of excessive speed and failure to properly apply the brakes, were subsumed in the instructions given by the trial court. Proper lookout and stopping within the statutorily prescribed number of feet from the crossing require the jury to consider whether Sharon Lemon was proceeding at an excessive rate of speed and had properly applied the brakes. We find no reversible error in the trial court’s refusal to submit these two claims.
 

 Next, appellants complain in point of error two the trial court improperly refused to submit to the jury their requested instruction number four. Appellants’ requested jury instruction number four stated: “ ‘Negligence’ when used with respect to the conduct of Sharon Elaine Lemon means the failure to drive at an appropriate reduced speed when approaching and crossing an intersection or railway grade crossing.” Appellants allegedly based this instruction on the language of Tex.Rev.Civ.Stat.Ann. art. 6701d, § 166(b), (c) (Vernon 1977), which requires a motorist to proceed “at an appropriate reduced speed when approaching and crossing a railroad grade crossing” consistent “with legal requirements and the duty of all persons to use due care.”
 
 Id.
 
 The trial court in its charge submitted to the jury the following negligence instruction:
 

 “NEGLIGENCE” means failure to use ordinary care; that is to say, failure to do that which a person of ordinary prudence would have done under the same or similar circumstances, or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.
 

 The trial court is not required to submit an instruction based upon statutory language if the statute’s standard of care is the same or substantially the same as the duty of ordinary care.
 
 Smith v. Central Freight Lines, Inc., 774
 
 S.W.2d 411, 415 (Tex.App.—Houton [14th Dist.] 1989, writ denied). Such is the ease with the present instruction, the negligence per se instruction requested by appellants was subsumed by the broad-form negligence instruction given by the trial court.
 
 See id.
 
 Further, the trial court does not err in refusing a requested instruction if the substance of the matter contained in the requested instruction was included in the court’s charge.
 
 Dixon v. Van Waters &
 
 
 *516
 

 Rogers,
 
 674 S.W.2d 479, 483 (Tex.App.—Fort Worth),
 
 writ refd n.r.e. per curiam,
 
 682 S.W.2d 533 (Tex.1984). The instruction given by the trial court properly presented, and assisted the jury in determining, the issue of Sharon Lemon’s negligence.
 
 See
 
 1 State Bar of Texas, Texas PatteRN Jury Charges PJC 2.01 (2d ed. 1987). The trial court did not abuse its discretion in refusing to submit appellants’ requested jury instruction number four.
 

 As to appellants’ allegation in point of error three that the trial court’s erroneous omission from the charge of their requested instructions denied them the submission of a primary defensive theory, we disagree. Having found no error in the trial court’s failure to submit any of the complained of instructions, we find no denial to appellants of the submission of a primary defensive theory. The issue of contributory negligence was properly submitted to the jury.
 

 Finally, we will address appellants’ contention in point of error four that the jury’s failure to find Sharon Lemon eontribu-torily negligent under questions five and six is against the great weight and preponderance of the evidence. In reviewing a great weight and preponderance challenge, we must examine the record to determine if there is some evidence to support the jury finding, and if so, then we must determine if the finding is so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and manifestly unjust.
 
 Dyson v. Olin Carp.,
 
 692 S.W.2d 456, 457 (Tex.1985);
 
 Traylor v. Goulding,
 
 497 S.W.2d 944, 945 (Tex.1973). In reviewing a great weight complaint such as this, which addresses the jury’s failure to find a fact, we must be mindful the jury was not convinced by a preponderance of the evidence that Sharon Lemon was contributorily negligent.
 
 Cropper v. Caterpillar Tractor Co.,
 
 754 S.W.2d 646, 651 (Tex.1988).
 

 A review of the record reveals there was ample evidence that Sharon Lemon’s view of the crossing was obstructed by the improperly parked railroad tank cars. There was expert testimony that even without the tank cars, a motorist approaching from the south would have their vision diminished or impaired by 81 percent due to other obstructions and distractions at this crossing. Additionally, there was evidence from other motorists who had similar accidents at the MLK crossing during daylight hours, who were unable to see the train until they were right on the track. The only evidence indicating the engineer was actually blowing the horn or ringing the bell, came from Johnson himself whose credibility the jury obviously questioned as can be seen from its answer to jury question one. Neither Wiley nor Phillips could state under oath that Johnson was blowing the horn or sounding the bell. The eye-witnesses stated the horn was blown two to three blocks back down the line and was not blown again as the train approached the MLK crossing and struck Sharon Lemon.
 

 The evidence indicated that no one actually knew whether Sharon Lemon had stopped before the crossbuck. Wiley and Johnson both stated they only knew the car was moving when it came into their view. They also testified the car was going slowly and then picked up speed. However, Wiley admitted he and Johnson had discussed their testimony together before testifying to these facts. The eye-witnesses testified they saw headlights coming slowly up the incline on the other side of the crossing. The best estimate of Sharon Lemon’s speed was around 15 miles an hour and the speedometer on her car was frozen at 12 miles an hour after the accident. The only person who estimated her speed at significantly higher than 15 miles an hour was Johnson who said she was going 20 to 30 miles an hour. Johnson, however, admitted this was just an estimate and he could be mistaken. Further, the expert testimony indicated if she had been going 20 to 30 miles an hour she would have cleared the crossing and an accident would not have occurred. As it was, she was faced with a complex driving task of perceiving and reacting to the train without enough time to accomplish this task according to expert testimony. We find there was ample evidence to support the jury’s determination of no contributory negligence on the part of Sharon Lemon.
 

 
 *517
 
 Appellants’ Group Two points of error one through four, regarding contributory negligence, are all overruled.
 

 GROUP THREE POINTS OF ERROR
 

 EXEMPLARY DAMAGES
 

 Under Group Three, appellants apparently raise twenty-two points of error, many of which are duplicitous and repetitive. The first two points of error raise essentially the same complaint. Appellants complain the trial court erred in awarding exemplary damages because the charge did not contain questions inquiring whether MoPac’s gross negligence and malice as found by the jury was committed by a vice principal of MoPac. In appellants’ third point of error, they allege the evidence was legally and factually insufficient to show that the gross negligence and malicious conduct found by the jury was committed by a vice principal of MoPac, was previously authorized by MoPac or was ratified by MoPac. This theme is restated in two other points of error. Next, in a multifarious point of error which is essentially three points of error in one, appellants contend the exemplary damages are immaterial because they are based upon theories that are: (1) not supported by legally or factually sufficient evidence (crew lookout), an issue previously raised and already disposed of under Group One points of error; (2) preempted as a basis for common law liability by federal law (speed and negligence in connection with extrahazardous crossing), another issue previously raised and already disposed of under Group One points of error; or (3) procedurally and substantively defective (failure to require that gross negligence or malice be that of a vice principal of the railroad), basically the same complaint already raised by points of error one and two under this group of points.
 

 Exemplary damages may not be awarded as a result of ordinary negligence, but must be based on gross negligence, or intentional or willful conduct.
 
 American Nat’l Ins. Co. v. Navarrete,
 
 758 S.W.2d 805, 809 (Tex.App.—El Paso 1988, writ denied). In this case, gross negligence was properly defined for the jury as “more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to establish that the act or omission was the result of actual conscious indifference to the rights, safety, or welfare of the person affected.”
 
 See
 
 Tex.Civ.PRAC. & Rem. Code Ann. § 41.001(5) (Vernon Supp.1993). This conduct may be either active or passive in nature, which means a finding of gross negligence can be based on either MoPac’s acts or omissions.
 
 Burk Royalty Co. v. Walls,
 
 616 S.W.2d 911, 922 (Tex. 1981). Conduct willfully committed with ill will, evil motive, or gross indifference or reckless disregard for the rights of others is malicious and will also support an award of exemplary damages.
 
 Dahl v. Akin,
 
 645 S.W.2d 506, 515 (Tex.App.—Amarillo 1982),
 
 ajfd,
 
 661 S.W.2d 911 (Tex.1983),
 
 cert. denied,
 
 466 U.S. 938,104 S.Ct. 1911, 80 L.Ed.2d 460 (1984). Malice may be established by direct or circumstantial evidence, and a plaintiff need not prove the defendant acted with personal spite, but may simply prove the defendant committed negligent acts in reckless disregard of another’s rights and with indifference as to whether that party would be injured. In the present case, malice was properly defined for the jury as:
 

 conduct that is specifically intended by [MoPac] to cause substantial injury to Sharon Elaine Lemon; or an act that is carried out by [MoPac] with a flagrant disregard for the rights of others and with actual awareness on the part of [MoPac] that the act will, in reasonable] probability, result in human death, great bodily harm, or property damage.
 

 See
 
 Tex.Civ.Prac. & Rem.Code Ann. § 41.-001(6) (Vernon Supp.1993).
 

 As a general rule, an affirmative finding by the jury as to either gross negligence or malice will support an award of exemplary damages. However, the rule in Texas is well settled that exemplary damages may only be recovered against a corporation, such as MoPac, for the gross negligence or malicious acts of its employees under certain circumstances. A plaintiff must establish the agent who was grossly negligent or who acted with malice was acting within the scope of employment and was something more than a
 
 *518
 
 mere servant, i.e., is employed in a managerial capacity or is a vice principal of the corporation; or the acts of the agent were previously authorized, or subsequently adopted or ratified by the corporation; or the employee was unfit and the corporation was reckless in employing him.
 
 See Purvis v. Prattco, Inc., 595
 
 S.W.2d 103, 104 (Tex.1980);
 
 Fisher v. Carrousel Motor Hotel, Inc.,
 
 424 S.W.2d 627, 630 (Tex.1967);
 
 Shearson Lehman Hutton, Inc. v. Tucker,
 
 806 S.W.2d 914, 926 (Tex. App.—Corpus Christi 1991, writ dism’d w.o.j.);
 
 Jim Walters Homes, Inc. v. Reed,
 
 703 S.W.2d 701, 706 (Tex.App.—Corpus Christi 1985),
 
 affd in part, rev’d in part on other grounds,
 
 711 S.W.2d 617 (Tex.1986). A vice principal of a corporation includes corporate officers, those who have authority to employ, direct, and discharge servants of the master, those engaged in the performance of non-delegable or absolute duties of the master, or those to whom the master has confided the management of the whole or a department or division of the business.
 
 Fort Worth Elevators Co. v. Russell,
 
 123 Tex. 128, 70 S.W.2d 397, 406-07 (Tex.1934);
 
 Shearson Lehman Hutton, Inc.,
 
 806 S.W.2d at 926;
 
 Southwestern Bell Tel. Co. v. Reeves, 578
 
 S.W.2d 795, 800 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ refd n.r.e.).
 

 Using the standards set out under Group One points of error, we will review the legal and factual sufficiency of the evidence. In the present case, the trial court submitted the charge to the jury by properly conditioning the questions regarding exemplary damages, upon an affirmative answer to the gross negligence or malice question, which questions were in turn' conditioned upon an affirmative answer to the questions regarding MoPac’s negligence. One of the acts of negligence which the jury was instructed to consider in determining MoPac’s negligence under question two was the improper parking of the railroad tank cars near the MLK crossing. The jury was further instructed it was negligence under Texas law for a railroad company to cause or allow trains, railway cars or equipment to stand less than 250 feet from the center line of any public grade crossing unless a closer distance cannot be avoided.
 
 See
 
 16 Tex.Admin.Code § 5.620(b) (West 1988) (Tex.R.R.Comm’n, Visual Obstructions at Public Grade Crossings). The fact that the railroad tank cars were parked approximately 105 feet away from the MLK crossing in violation of state law and MoPac’s company policy was uncontroverted.
 

 Kenneth Lott (Lott), the City Administrator of Sweeny, testified he drafted and mailed, in March 1979, a letter to Mr. O.E. Knox, Assistant to the General Manager of MoPac in Houston, Texas. This letter, a copy of which was introduced into evidence, informed MoPac that the city council had declared the MLK crossing (at that time named the Ash Street crossing) “an extra special hazard” because the “six sets of tracks present a problem in that when railroad cars are parked next to the crossing, this severely limits visibility [and] [o]ne or two accidents have occurred at this location ... involving a moving train and a motor vehicle.” There was no response to this letter by MoPac and it could not be found in their files. Another letter, introduced into evidence, was sent by Lott on November 8, 1988 to P.L. Tucker (Tucker), Division Superintendent, Union Pacific Railroad Company in Houston, Texas. This letter concerned safety at the MLK crossing, the multiple tracks, the lack of signals, asked the railroad to “[p]lease help” the City of Sweeny solve the safety problem at the MLK crossing, and informed Tucker the MLK “crossing [wa]s the only access to the Southend Subdivision where several hundred [Sweeny] citizens live.” In a letter dated November 17, 1988, Tucker responded by ignoring Sweeny’s plea for assistance, and referring the City to the State Highway Department which handles the funding index for the State and allots federal funds for signals and improvements at railroad grade crossings.
 

 The evidence was also uncontroverted that Shoemaker, MoPae’s Director of Industry and Public Projects, was responsible for maintaining an inventory of information on each of Union Pacific’s crossings, including MoPac’s MLK crossing. This inventory included information about accidents which occurred at the crossing between moving trains and motor vehicles. The jury heard further uncontroverted testimony from other Sweeny citizens who were struck by moving trains at
 
 *519
 
 the MLK crossing. These drivers testified that, even in daylight hours, they were unable to see the train until they pulled on the track in front of the train, because their vision was blocked by parked railroad cars. Their testimony showed they were fortunate to have enough time to punch the gas and get partially off the tracks before being struck by the train, a luxury Sharon Lemon did not have. These accidents were reported to Mo-Pac and would have been included in Shoemaker’s inventory on the MLK crossing. Additionally, the evidence indicated that Sweeny citizens complained to, and signed petitions to be sent to, MoPac concerning safety in general at the MLK crossing, and the railroad cars parked too close at the MLK crossing which blocked visibility. However, the City’s and its citizens’ pleas fell on deaf ears as MoPac took no action to enforce compliance with § 5.620(b) or its own rule, implemented in part to provide safety and visibility at grade crossings.
 
 See
 
 16 Tex.Admin.Code § 5.620(b) (West 1988) (Tex. R.R.Comm’n, Visual Obstructions at Public Grade Crossings).
 

 Further, not only was compliance with the statute and rule not enforced, but compliance was not even required or expected by Mo-Pac. Ronald Daniel (Daniel), the engineer who set those tank cars out on the track too close to the MLK crossing, gave uncontro-verted testimony that the ordinary operating policy was not to measure the distance of the cars from the crossing but to do an eyeball estimate. In fact, Daniel testified the train crew is not provided any instrument, implement, or equipment with which to measure the distance between the last car and the crossing. Instead, the train crew eyeballs how much room they have to set out cars as they are passing the crossing on their way to set out the cars. Daniel testified no one on the crew goes back to check and see if they have pushed the end of the line of cars too close to the crossing when they were setting the cars out because MoPac does not have a rule requiring the crew to do so. He stated if a crew member felt the cars were too close he would say something and some of the cars could be moved to another track. His testimony, however, does not make it apparent how anyone on the crew would know the cars were too close since no measurement is required or made, and no one is required to, or actually does, go back to check the distance anyway. His testimony makes it clear the best guess estimate method of insuring visibility and safety at crossings, including the MLK crossing, is the authorized method of procedure for MoPac despite the fact MoPac was aware of accidents, and the City of Sweeny’s concern about safety at the MLK crossing.
 

 John D. Hopkins, Manager of Terminal Operations for MoPac, testified that part of his and Landrith’s duties were to make periodic checks on compliance with rules and safety procedures. He stated he had on one occasion noticed train cars parked too close to the MLK crossing and had ordered them moved. However, there was no indication he investigated to find out who set the cars out improperly and why it was done, or that he ordered anyone disciplined for the violation. In fact, Hopkins testified he was not concerned that the tank cars might have impaired Sharon Lemon’s vision. He appeared quite flip about the situation indicating that he knew 107 feet was a safe distance, despite the company rule and state regulation. Hopkins felt Sharon Lemon could see fine, and did not show any remorse about the safety hazard or violation.
 

 The next question in the jury charge to address MoPae’s negligence, is question four which was to be answered only if the jury found the MLK crossing to be extra-hazardous. The jury made such an extra-hazardous finding regarding the MLK crossing. Thus, under question four, the jury was instructed to consider the failure to provide automatic signals (such as gates, cantilevers, or flashing lights) and the failure to provide a flagman at the MLK crossing in determining MoPac’s negligence. The evidence discussed above makes it clear MoPac was well aware of the safety conditions at the MLK crossing. Despite this fact, the evidence was uncontro-verted that Johnson’s timetable contained instructions for the train to be preceded by a flagman at three different crossings in Hills-boro, Texas, but his timetable contained no such instruction for the MLK crossing in Sweeny. Further, despite MoPac’s knowl
 
 *520
 
 edge of the safety conditions and accidents at the MLK crossing, it took no action to protect the citizens of Sweeny by installing some type of automatic signal as requested by the City of Sweeny. Shoemaker, MoPac’s Director of Industry and Public Projects, who had a three to five million dollar budget just for signal projects testified MoPac certainly had the ability to purchase automatic signal equipment and install it at the MLK crossing so long as it got State approval. Despite the fact there was nothing to prevent MoPac from purchasing signals or warning devices for the MLK crossing, Shoemaker testified MoPac did not do so because it was against their policy. Instead, their' policy was to utilize their funds only on projects which came up on the State’s funding index, an index which was not a safety index. Obviously, Tucker was acting within this company policy when he referred the City of Sweeny to the State Highway Department without any response or concern for the safety of the public using the MLK crossing.
 

 Along these same lines, the jury heard expert testimony from John Robert Dodson (Dodson), who worked for the Texas Highway Department for 36 years and was responsible for developing the funding index used by the State to distribute federal funds for railroad crossing improvements. Dodson testified the State program does not prevent municipalities or railroads from spending their own money to upgrade signals at unsafe crossings, and in fact it encourages them to do so. He indicated the only requirement is for the railroad to get State approval on the type of equipment they purchase and install. The evidence indicated the cost of an automatic warning device with arms and lights, however, ran approximately $100,000 and such devices were more expensive for MoPac to maintain than the passive devices MoPac had in place at the MLK crossing. The jury could reasonably infer from the evidence that MoPac was taking a cost versus safety gamble with the MLK crossing by waiting for the crossing to come up on the State funding index so that federal funds could pay for the brunt of signalization and improvement costs, and Sharon Lemon was the loser of this gamble.
 

 The factor which “lifts ordinary negligence into
 
 gross
 
 negligence is the mental attitude of the defendant_”
 
 Burk Royalty Co.,
 
 616 S.W.2d at 922. In addition, it is the knowledge of the defendant that a reasonable probability for serious harm to occur exists when he acts, which will lift negligent conduct into malicious conduct. The railroad argues the evidence discussed above is “at best, ... the result of misunderstanding, carelessness, or forgetfulness,” meaning the railroad’s conduct did not rise to the “level of gross negligence or malice[,]” and “the finding of malice is more than merely unsupported by evidence; it is
 
 absurd.”
 
 (emphasis added) We disagree. The evidence, as set out above, was sufficient to establish such an entire want of care on the part of MoPac as to show the setting out of the railroad cars too close to the intersection, or the failure to respond to requests and complaints about safety at the MLK crossing by installing some type of active warning devices, was the result of a conscious indifference to the rights, safety, or welfare of the citizens of Sweeny. These acts and omissions were carried out by MoPac with a flagrant disregard for the rights of the public and with actual awareness by MoPac that they would in reasonable probability result in human death, great bodily harm or property damage. Either the act or the omission would have been sufficient to support a gross negligence and malice finding by the jury.
 

 Having determined that the jury’s findings of gross negligence and malice are amply supported by the record, we now address whether this conduct was committed by a vice principal of MoPac, was committed during the performance of a non-delegable or absolute duty of MoPac, or was authorized, adopted or ratified by MoPac. Daniel testified that on the day of the accident his crew set out the tank cars at the MLK crossing and there was plenty of other empty track space available to set the cars out on had they realized they were too close to the crossing. He stated he was aware that under MoPae’s rules his crew was required to move some of the cars to one of the empty tracks if, by setting out some tank cars, the cars were less than 260 feet from the crossing. However, they did not realize the cars
 
 *521
 
 were too close, which is logical since ordinary operating procedure required no measurement of the distance, and so they left them parked within 105 feet of the MLK crossing.
 

 Landrith, Manager of Train Operations for MoPac, testified he measured the distance from where the wheel of the end tank car made contact with the rail to the edge of the grade crossing and it was 107 feet. He stated he reported to Hopkins, Manager of Terminal Operations for MoPac, there were some cars at the MLK crossing which needed to be moved. He further testified he determined it was Daniel’s crew which set the tank cars out too close to the crossing. Landrith testified he spoke with a member of Daniel’s crew about the tank cars, but did not discipline or recommend discipline for any member of the crew for violating the rule. In fact, the crew was not disciplined for this violation. Even if the common operating procedure used at the MLK crossing was not authorized by MoPac, it was certainly ratified by this conduct.
 

 MoPac attempted to establish, through the testimony of Hopkins, that none of the employees notified of safety hazards, concerns or problems, and actual train-automobile accidents at the MLK crossing were vice principals of the corporation. However, his description of his and Landrith’s duties, firmly established that they were responsible for, directed, and managed the activities of the crews in their area. In fact, Hopkins was additionally responsible for supervising and managing the activities of the other managers in his territory. In addition, despite evidence indicating Tucker was a vice principal of MoPac because he was in a management position and a division superintendent, Hopkins attempted to establish Tucker had no authority to hire and fire employees. However, Hopkins subsequent testimony made it evident he was basing this allegation on the fact that under MoPac’s collective bargaining agreement with the Union, employees could only be permanently terminated by a mediation board. This procedural step required by the collective bargaining agreement does not remove Tucker’s authority, which it was indicated he had, or for that matter the authority of any other of MoPae’s managers whose job description permits it, to hire and fire for purposes of the vice principal definition. These employees satisfy the definition of a vice principal. Further, the evidence ■ is uncontroverted that Shoemaker was a vice principal of MoPac.
 

 Even if this activity had not been authorized or ratified by a vice principal of MoPac, Daniel’s crew was carrying out a non-delegable or absolute duty of MoPac, when it set out the train cars. Compliance with the 250 foot requirement under § 5.620(b) is a company function which is non-delegable by MoPac and is an absolute requirement.
 
 See Alamo Nat’l Bank v. Kraus,
 
 616 S.W.2d 908, 910-11 (Tex.1981);
 
 Rainbow Express, Inc. v. Unkenholz,
 
 780 S.W.2d 427, 432 (Tex.App. — Texarkana 1989, writ denied). Thus, Daniel’s crew would be vice principals of MoPac as a matter of law simply because of the nature of the duty they were performing.
 
 See
 
 16 Tbx.Admin.Code § 5.620(b) (West 1988) (Tex.R.R.Comm’n, Visual Obstructions at Public Grade Crossings).
 

 As to the failure to install signals at the MLK crossing, there was no need for a question to establish vice principal or authorization, where the uncontroverted evidence established it was MoPac’s policy not to spend its funds on signals no matter what safety problems were brought to its attention. Such evidence is sufficient on its face to establish authorization by MoPac for the failure to provide automatic signals at the MLK crossing and the fact that this authorization came from vice principals of the corporation, as illustrated by Shoemaker’s testimony.
 

 A review of the record reveals there was no need to submit an issue on whether the gross negligence and malicious conduct of MoPac was committed by a vice principal of MoPac, was committed during the performance of a non-delegable or absolute duty of MoPac, or was authorized, adopted or ratified by MoPac, because these facts were established as a matter of law.
 
 See, e.g., Rainbow Express, Inc.,
 
 780 S.W.2d at 432;
 
 Jim Walters Homes, Inc.,
 
 703 S.W.2d at 706 (citing Tex.R.Civ.P. 279; and
 
 Pope v. Darcey,
 
 667 S.W.2d 270 (Tex.App. — Houston [14th Dist.] 1984, writ refd n.r.e.)). Appellants’
 
 *522
 
 first eight points of error under Group Three are all overruled.
 

 Next, in Group Three points of error nine, ten, and eleven, appellants complain of the trial court’s award of exemplary damages based on the jury’s verdict. They allege the evidence is legally and factually insufficient to support the jury’s exemplary damages answers to questions fourteen and fifteen. Additionally, they contend the amount of exemplary damages awarded by the jury was excessive.
 

 An award of exemplary damages is left to the sound discretion of the jury, and will not be set aside unless it is so large, based on the award of actual damages and all the surrounding circumstances of the case, as to indicate the award was the result of passion or prejudice, or the evidence was disregarded by the jury.
 
 Goswami v. Thetford,
 
 829 S.W.2d 317, 321 (Tex.App.—El Paso 1992, writ denied). When reviewing the reasonableness of an award of exemplary damages, we must consider the factors set out in
 
 Alamo Nat’l Bank v, Kraus,
 
 616 S.W.2d 908 (Tex.1981). These five factors “are (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety.”
 
 Id. See Goswami
 
 829 S.W.2d at 321. Further, the amount of exemplary damages awarded must be reasonably proportioned to the amount of actual damages awarded.
 
 Alamo Nat’l Bank,
 
 616 S.W.2d at 910.
 

 Based on the facts discussed earlier in this opinion, we find the nature of the wrong, the character of MoPac’s conduct, the degree of culpability of MoPac, the situation and sensibilities of MoPac and the citizens of Sweeny, particularly those who use this crossing daily, and the extent to which MoPae’s conduct offends the public sense of justice and propriety is sufficient to support this award of exemplary damages. Additionally, we have found there was ample evidence to support the jury’s findings of both gross negligence and malice on the part of MoPac and its employees, and this conduct was properly imputed to MoPac as a matter of law. The rule is well settled that an award of exemplary damages is proper where based upon a finding of gross negligence, malice or fraud. Tex.Civ.PRAC. & Rem.Code Ann. § 41.003(a) (Vernon Supp.1993). The record reflects Sharon Lemon’s death was caused by being struck by a MoPac train while her vision was obstructed by improperly and illegally parked MoPac tank cars at a crossing which MoPac knew was unsafe but refused to spend the money on for signals to warn motorists of an approaching train, or to otherwise improve safety conditions. None of MoPac’s employees expressed or indicated any remorse or gave the impression that MoPac’s policies would change as a result of this accident.
 

 Further, the jury properly received evidence regarding MoPac’s financial ability indicating that the railroad’s net worth was one billion one hundred and forty-three million dollars.
 
 See Transmission Exch, Inc. v. Long,
 
 821 S.W.2d 265, 273 (Tex.App. — Houston [1st Dist.] 1991, writ denied). When the appellees argued this case to the jury, they contended that an award of $11,000,000 to $22,000,000 in exemplary damages would be required to get the attention of a large corporation like MoPac. The amount of exemplary damages awarded was $10,000,000 and the amount of actual damages $2,218,018.28, a ratio of 4.5 to 1. There is nothing to indicate the jury disregarded the evidence or determined the amount of exemplary damages based upon passion or prejudice.
 

 The evidence is both legally and factually sufficient to support the jury’s award of exemplary damages. The award of exemplary damages in this case was not excessive. Group Three points of error nine, ten, and eleven are all overruled.
 

 In Group Three point of error twelve, appellants complain the trial court erred in failing to eliminate from the judgment the $500,000 in exemplary damages awarded to the Estate of Sharon Lemon because the Estate of Sharon Lemon was not awarded any actual damages as required by Tex.Civ.Prac. & Rem.Code Ann. § 41.004(a) (Vernon Supp.1993).
 

 
 *523
 
 This complaint is without merit. Under question thirteen, the jury was asked: “What sum of money would have fairly and reasonably compensated Sharon Elaine Lemon for the following: Element a. Medical expenses[;] ... Element b. Funeral and burial expenses[; and] ... Element c. Damage to automobile.” This is the proper method to submit compensatory damages in a survival action as set out in the Texas Pattern Jury Charge.
 
 See
 
 1 State BaR of Texas, Texas PatteRN Jury Charges PJC 9.02 (2d ed. 1987). Such a question regarding compensatory damages “is intended to include all elements of damages that accrued to the decedent from the time of injury until death.”
 
 Id.
 
 at PJC 9.02 cmt. at 4-5. In this case, the damages submitted by the trial court under question thirteen were for decedent Sharon Lemon’s medical, funeral, burial and automobile expenses, all of which are actual damages properly recoverable
 
 by the estate on behalf of the decedent
 
 pursuant to Tex.Civ. Prac. & Rem.Code Ann. § 71.021 (Vernon 1986).
 
 See
 
 1 State Bar of Texas, Texas Pattern Jury Charges at PJC 9.02 cmt. at 5. Clearly these damages which accrued to Sharon Lemon prior to her death and which survived her death via the survival statute, cannot literally be recovered by Sharon Lemon since she is dead but must be recovered by her estate on her behalf. Additionally, it should be noted that question thirteen was not phrased to ask what sum of money
 
 would
 
 fairly and reasonably compensate Sharon Lemon but instead asked what sum of money
 
 would have
 
 fairly and reasonably compensated Sharon Lemon, indicating the question was not awarding damages directly to Sharon Lemon.
 

 Under question fourteen the jury was asked: “What sum of money should be assessed against MoPac as exemplary damages, if any, for the death of Sharon Elaine Lemon?” This was the proper method to submit exemplary damages in a survival action and/or a wrongful death action.
 
 See id.
 
 at PJC 8.06, 9.03. Exemplary damages are properly recoverable
 
 by the estate on behalf of the decedent
 
 under the Texas survival statute.
 
 Id.
 
 at PJC 8.06 cmt. at 24, 9.03 cmt. at 8. Thus, both the actual compensatory damages and the exemplary damages are being recovered by the estate on behalf of Sharon Lemon.
 

 Under question fifteen exemplary damages were apportioned between Alfred DeJuan Franklin, Dewey Lemon, and the Estate of Sharon Lemon, with the Estate receiving five percent of the $10,000,000 award. Question fifteen was properly submitted to apportion the exemplary damages among the plaintiffs.
 
 Id.
 
 at PJC 9.03 cmt. at 8.
 

 The award of exemplary damages to the Estate of Sharon Lemon was properly predicated on an award of actual damages to the Estate of Sharon Lemon, and both are recoverable by the estate on behalf of Sharon Lemon. All of appellees’ questions followed the Texas Pattern Jury Charge and there was no error in failing to include the phrase the Estate of Sharon Lemon in question thirteen. Appellants’ Group Three point of error twelve is overruled.
 

 In Group Three points of error thirteen and fourteen, appellants complain the Texas system for awarding exemplary damages in general, and as applied in this case, violates the due process clause of the United States Constitution and the due course of law provision of the Texas constitution.
 
 See
 
 U.S. Const, amend. XIV; Tex. Const, art. I, §§ 13, 19.
 

 The common law method for awarding punitive or exemplary damages in all tort actions has been approved in the United States since at least 1852, before the Fourteenth Amendment was even adopted.
 
 See Day v. Woodworth^
 
 54 U.S. (13 How.) 363, 371, 14 L.Ed. 181, (1852) (sanctioning use of exemplary damages based on enormity of defendant’s offense and not on measure of compensation to plaintiff). As noted by the United States Supreme Court, “[n]othing in th[e Fourteenth] Amendment’s text or history indicates an intention on the part of its drafters to overturn the prevailing method[ ]” for assessing exemplary damages.
 
 Pacific Mut. Life Ins. Co. v. Haslip,
 
 499 U.S. 1,17-18, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1 (1991) (citing
 
 Burnham v. Superior Court of Cal.,
 
 495 U.S. 604, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990); and
 
 Snyder v. Massachusetts,
 
 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934)).
 

 
 *524
 
 The use of the common law method for awarding exemplary damages has long been used with approval in Texas. The Texas Supreme Court noted in 1849 that a jury could award “damages not only to recompense the sufferer, but to punish the offender” in cases involving malice, vexation, fraud or oppression.
 
 Graham v. Roder,
 
 5 Tex. 141 (1849).
 
 [5]
 
 The role of exemplary damages in Texas was reexamined by the Texas Supreme Court in
 
 Hofer v. Lavender,
 
 679 S.W.2d 470 (Tex.1984). The
 
 Hofer
 
 opinion states the purposes of punitive damages in Texas are to punish the wrongdoer, serve as an example to others, reimburse plaintiff for losses too remote or speculative to be considered elements of strict compensation, and compensate plaintiff for inconvenience and attorney’s fees.
 
 Id.
 
 at 474. These purposes are consistent with the common law method of awarding exemplary damages which has been upheld as not “so inherently unfair as to deny due process and be
 
 per se
 
 unconstitutional.”
 
 Haslip,
 
 499 U.S. at 17, 111 S.Ct. at 1043.
 

 The United States Supreme Court, in the
 
 Haslip
 
 case, had occasion to review a due process challenge to Alabama’s punitive damages system.
 
 See id.
 
 at 8-24, 111 S.Ct. at 1038-46. This challenge failed because the Court found a defendant had the benefit of “the full panoply of Alabama’s procedural protections” which included adequate instruction to the jury, a post-verdict hearing, and the benefit of review by the Alabama Supreme Court.
 
 Id.
 
 at 19-24, 111 S.Ct. at 1044-46. The Court has recently revisited the issue of a due process challenge to a state’s exemplary damages system in
 
 TXO Production Corporation v. Alliance Resources Corporation,
 
 — U.S. —, 113 S.Ct. 2711, 126 L.Ed.2d 366 (1993). In
 
 TXO,
 
 the Court upheld as not xcessive an award of punitive damages 526 times as large as the actual damages awarded in a slander of title judgment from the state of West Virginia.
 
 See id.
 

 The
 
 TXO
 
 opinion reiterated the statement in
 
 Haslip
 
 that the Court “need not, and ... cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case, ... [but] [a] general concer[n] of reasonableness ... properly enter[s] into the constitutional calculus.”
 
 Id.
 
 at -, 113 S.Ct. at 2713 (citing
 
 Pacific Mut. Life Ins. Co. v. Haslip,
 
 499 U.S. 1, 18, 111 S.Ct. 1032, 1043,113 L.Ed.2d 1 (1991)). In addition, the Court discusses various factors which should be considered in assessing punitive damages. These factors include: a reasonable relationship between actual damages and exemplary damages; a reasonable relationship between exemplary damages and the magnitude of the harm caused, as well as the magnitude of the potential harm that defendant’s conduct would have caused its intended victim or other victims if similar conduct were not deterred; financial position of defendant; adequate jury instruction; and the intangible factors “based on a host of facts and circumstances unique to the particular case ...” which the jury must consider and make a qualitative assessment upon.
 
 Id.
 
 — at -, -, -, 113 S.Ct. at 2720-2721, 2722, 2723.
 

 Despite the fact that the Texas system for awarding exemplary damages is based upon the common law method, Texas has also provided a defendant with procedural safeguards which must be met before the imposition of exemplary damages can take place.
 
 See
 
 Tex.Civ.Prac. & Rem.Code Ann. §§ 41.-001-.009 (Vernon Supp.1993) (Chapter 41, Exemplary Damages). Sections 41.001-.009 were enacted as part of Texas’ general tort reform legislation and were intended to reform portions of Texas’ common law system for awarding exemplary damages.
 
 See
 
 John T. Montford & Will G. Barber,
 
 1987 Texas Tort Reform: The Quest for a Fairer and More Predictable Texas Civil Justice System Part Two,
 
 25 Hous.L.Rev. 245, 314-41 (1988). These sections, however, were not intended to replace or supplement existing common law, and “[t]o the extent that prior ... common law [regarding exemplary damages]
 
 *525
 
 does
 
 not
 
 conflict with this new Chapter 41, it still exists and applies[ ]” but where it does conflict “the new law prevails.”
 
 Id.
 
 at 315.
 

 The Montford article gives an excellent synopsis of the provisions under Chapter 41 which is set out below:
 

 (1) limits the amount of exemplary damages recoverable in certain tort actions to the greater of $200,000 or four times actual damages [except in cases with an express finding of malice or involving an intentional tort];
 

 (2) reduces the grounds for recovering exemplary damages in such suits to three statutorily defined standards: fraud, malice, and gross negligence [as a basis for recovering exemplary damages, statute narrows and tightens common law definition of malice, and modifies common law definition of gross negligence to focus on the particular defendant’s actual conscious indifference in each case];
 

 ⅜ ⅝ ⅛ ⅜ * ⅝
 

 (4) provides that the claimant’s burden of proof cannot be satisfied by ordinary negligence or shifted to the defendant;
 

 (5) codifies that exemplary damages cannot be recovered if only nominal damages are awarded, or if the claimant elects multiple-damages under another statute;
 

 (6) confirms that there is no joint and several liability and no prejudgment interest with respect to exemplary damages; and
 

 (7) lists various statutory actions to which this new law does not apply.
 

 Id.
 
 at 314.
 

 A defendant in Texas has the procedural safeguards set out in Chapter 41, the common law limitation that punitive damages are for the purpose of deterrence and punishment, and the post-trial and appellate review system. The Texas system in general provides sufficient restraints on the award of exemplary damages to satisfy due process and due course of law requirements.
 

 In this particular case, the jury was asked what sum of money should be assessed against MoPac for the death of Sharon Lemon as exemplary damages and was instruct ed: “ ‘Exemplary damages means an amount that you may in your discretion award as an example to others and as a penalty or by way of punishment, in addition to any amount that you may have found as actual damages.” The instruction given to the jury properly defines the two primary common law purposes for exemplary damages in Texas, deterrence and punishment, and limits the jury’s award of exemplary damages to these purposes. Although not as lengthy as the jury instructions upheld in the
 
 Haslip
 
 case, the question and instruction in this case similarly “enlightened the jury as to the punitive damages’ nature and purpose, identified the damages as punishment for civil wrongdoing of the kind involved, and explained that their imposition was not compulsory.”
 
 Haslip,
 
 499 U.S. at 19, 111 S.Ct. at 1044. This method of submission is in compliance with the traditional common law approach for submitting exemplary damages to the jury and satisfied due process constraints.
 

 This suit was filed and the case was tried pursuant to Chapter 41, and the jury was instructed accordingly. The trial court’s definitions of gross negligence, malice, and exemplary damages as submitted to the jury were taken from the definitions in section 41.001.
 
 See
 
 Tex.Civ.Prac. & Rem.Code Ann. § 41.001(3), (5), (6) (Vernon Supp.1993). Additionally, the trial court submitted the exemplary damages questions conditioned upon a finding of gross negligence or malice in compliance with section 41.003.
 
 See id.
 
 § 41.-003(a)(2), (3), (b). Further, the award of exemplary damages was predicated upon an award of actual damages as required by section 41.004 and there was no prejudgment interest awarded on the exemplary damages amount as section 41.006 requires.
 
 See id.
 
 §§ 41.004(a), 41.006.
 

 The trial court, which had the benefit of hearing the evidence, had an opportunity to review the award of exemplary damages via appellants’ post-trial motion to disregard the jury findings, motion for new trial, motion for remittitur, motion to modify, correct, or reform the judgment and rule 301 motion for judgment non obstante veredicto. The record reflects the trial court considered each of these motions and overruled them
 
 *526
 
 either by signed written order or in open court. Like the trial judge in the
 
 TXO
 
 case, the trial court did not articulate in its post-trial review its reasons for upholding the jury’s award of exemplary damages. Although the United States Supreme Court noted such an explanation by the trial court would have been helpful, the Court stated “we certainly are not prepared to characterize the trial judge’s failure to articulate the basis for his denial of the motions for judgment notwithstanding the verdict and for remittitur as a constitutional violation.”
 
 TXO Prod. Corp.,
 
 — U.S. at-, 113 S.Ct. at 2724. Likewise, we fail to find any constitutional violation in this case. Further, as is evident by our previous and current discussion of the award of exemplary damages, appellants’ complaints have had the benefit of rather extensive appellate review of the evidence, the factors under
 
 Kraus,
 
 and the United States Supreme Court’s opinions in
 
 Haslip
 
 and
 
 TXO.
 

 The award of exemplary damages assessed by the jury was substantiated and in accord with Texas legal principles. As to federal considerations, the United States Supreme Court, in calculating exemplary damages, has “eschewed an approach that concentrates entirely on the relationship between actual and punitive damages[ ]” and has found it “appropriate to consider the magnitude of the potential harm that defendant’s conduct would have caused, ... as well as the possible harm to others ... if similar future conduct were not deterred.”
 
 See TXO,
 
 — U.S. at-, 113 S.Ct. at 2722. We find there exists a reasonable relationship between the amount of exemplary damages awarded, and the actual harm caused (the death of Sharon Lemon), as well as the potential harm that appellants’ conduct would cause other victims (the death of other Sweeny residents and injury to their persons and property), if similar conduct were not deterred. The jury had many intangible factors to consider in trying to put a price on the loss of human life.
 
 See id.
 
 The life of a wife, mother, daughter whom the evidence showed was dearly loved and sorely missed. Certainly the jury considered preventing such a loss to another family in the Southend Subdivision who used the MLK crossing.
 

 The Texas system of awarding exemplary damages, as applied in this case, did not violate the due process clause of the United States Constitution or the due course of law clause of the Texas constitution. Group Three points of error thirteen and fourteen are overruled.
 

 In Group Three points of error fifteen and nineteen, appellants raise essentially the same complaint. Appellants complain they were denied due process and due course of law, because the trial court refused to submit their requested jury instruction number eight. Their requested instruction number eight stated:
 

 “Exemplary damages” means an amount which you may in you discretion award as an example to others and as a penalty or by way of punishment, in addition to any amount that you may have found as actual damages. In determining the amount of exemplary damages you may consider the nature of the wrong, the character of the conduct involved, the degree of culpability of the wrongdoer, the situation and sensibilities of the parties concerned, the extent to which such conduct offends a sense of justice and propriety, and [MoPac]’s net worth. However, the evidence of net worth is not to be used (i) to override the requirement that any punitive damages must be reasonably proportionate to the actual damages in the case, (ii) to override the other five factors, (iii) for any purposes of vindictiveness or out of any passion of prejudice against [MoPac] simply because it is prosperous.
 

 Adequate jury instruction is a consideration when reviewing a due process challenge to an award of exemplary damages, and we have previously reviewed the instruction submitted by the trial court and found it to be proper. The submitted instruction reasonably accommodated MoPac’s “interest in rational decisionmaking” and Texas’ “interest in meaningful individualized assessment of appropriate deterrence and retribution.” As we have already upheld the exemplary damages instruction given by the trial court in this case as meeting the reasonable constraints required by due process, the trial
 
 *527
 
 court’s refusal to submit this requested instruction was not an abuse of discretion and did not rise to the level of a constitutional violation. We overrule Group Three points of error fifteen and nineteen.
 

 In Group Three points of error sixteen and twenty, appellants raise essentially the same complaint. Appellants allege they were denied due process and due course of law by the trial court’s refusal to submit their requested jury instruction number five. Their requested jury instruction number five stated:
 

 You are instructed that in determining whether certain conduct constitutes “gross negligence” or “malice”, your answers must be based on “clear and convincing evidence” rather than a preponderance of the evidence. Clear and convincing evidence is defined as that measure or degree of proof which produces a firm belief or conviction as to the truth of the allegations sought to be established. This is an intermediate standard, falling between the preponderance of the evidence standard and the reasonable doubt standard of criminal proceedings.
 

 There is nothing in the common law method for assessing exemplary damages, or in Chapter 41, Texas’ exemplary damages statutes, which requires gross negligence or malice to be established by anything other than a preponderance of the evidence.
 
 See
 
 Tex.Civ.Prac. & RemCode Ann. §§ 41.001-.009 (Vernon Supp.1993). In fact, tort reform advocates recommended a change in the proof requirement to “clear and convincing” but such a change was not approved and was not included in the final legislation enacted under Chapter 41.
 
 See id,.;
 
 Montford,
 
 1987 Texas Tort Reform,
 
 25 Hous.L.Rev. at 333-34 (citing Hearings on Tex.S.B. 287 Before the Senate Comm, on Econ.Dev., 70th Leg. 36 (Mar. 2,1987); Hearings on Tex.S.B. 287 Before the Senate Comm, on Econ.Dev., 70th Leg. 36 (Mar. 5, 1987); House/Senate Joint Committee on Liability Insurance and Tort Law and Procedure, Majority Report 189 (filed with the 70th Leg., Jan. 1987)).
 

 Since appellants’ requested instruction was based on an incorrect burden of proof under Texas law, the trial court did not abuse its discretion in refusing to submit the instruction. Further, the United States Supreme Court noted in
 
 Haslip
 
 that the Due Process Clause does not require a higher standard of proof such as “clear and convincing.”
 
 Haslip,
 
 499 U.S. at 23 n. 11, 111 S.Ct. at 1046 n. 11. Thus, the trial court’s refusal was not a constitutional violation. Group Three points of error sixteen and twenty are overruled.
 

 In Group Three points of error seventeen and twenty-one, appellants raise essentially the same complaint. Appellants argue they were denied due process and due course of law because the trial court admitted evidence of their net worth over objection.
 

 The only evidence of the railroad’s financial position that was admitted by the trial court was the stipulated evidence as to net worth for the year 1989. There was no objection by appellants as to the admission of the stipulated evidence. Additionally, evidence of a defendant’s financial position is a factor properly considered by the jury under Texas law and the jury’s consideration of such evidence has been approved by the United States Supreme Court.
 
 See TXO,
 
 — U.S. at-, 113 S.Ct. at 2723;
 
 Haslip,
 
 499 U.S. at 20-22, 111 S.Ct. at 1045;
 
 Transmission Exch., Inc.,
 
 821 S.W.2d at 273.
 
 See also Lunsford v. Morris,
 
 746 S.W.2d 471, 473 (Tex.1988) (orig. proceeding). Further, ap-pellees, out of an abundance of caution, did not even attempt to bring this evidence before the jury until there was already a showing of gross negligence and malice.
 

 The trial court did not abuse its discretion in admitting the evidence of net worth and there was no constitutional violation. Group Three points of error seventeen and twenty-one are overruled.
 

 In Group Three points of error eighteen and twenty-two, appellants raise essentially the same complaint. Appellants complain they were denied due process and due course of law because of the trial court’s denial of their request for a bifurcated trial.
 

 A trial court may generally order a bifurcated trial of any claim or issue to do justice, in the furtherance of convenience,
 
 *528
 
 and to avoid prejudice. Tex.R.Civ.P. 174(b);
 
 Guaranty Fed. Sav. Bank v. Horseshoe Operating Co.,
 
 793 S.W.2d 662, 668 (Tex.1990). However, a trial court’s decision on whether to grant or deny a bifurcated trial is renewable under an abuse of discretion standard and will not be reversed unless an appellant can show reversible error under Tex. R.App.P. 81(b).
 

 The law in Texas does not mandate a bifurcated trial on exemplary damages.
 
 See
 
 Tex.Civ.Prac. & Rem.Code Ann. §§ 41.-001-.009 (Vernon Supp.1993);
 
 Lunsford,
 
 746 S.W.2d at 473.
 
 See also Miller v. O’Neill,
 
 775 S.W.2d 56, 59 (Tex.App. — Houston [1st Dist.] 1989, orig. proceeding). We find nothing in the due process clause as construed by the United States Supreme Court in the
 
 Haslip
 
 and
 
 TXO
 
 opinions to require a bifurcated trial on exemplary damages. Additionally, other than alleging that the Texas system encourages the jury to award runaway damages, and noting that a bifurcated trial
 
 would
 
 prevent jury prejudice brought about by evidence of net worth, appellants have demonstrated no actual harm in this case from the trial court’s refusal to grant the requested bifurcation.
 

 Having found no prejudice on the part of the jury and no runaway damages, we fail to find the trial court abused its discretion in refusing to grant a bifurcated trial, and such refusal was not a constitutional violation. Group Three points of error eighteen and twenty-two are overruled.
 

 GROUP FOUR POINTS OF ERROR
 

 ACTUAL DAMAGES
 

 Under Group Four, appellants raise four points of error. Point of error one complains the trial court erred in refusing to eliminate all damages awarded to Sharon Lemon under question thirteen because she was not a party to this suit. Appellants have presented no argument or authorities under this point of error and we have already addressed the propriety of the actual damages awarded under question thirteen in Group Three point of error twelve. Group Four point of error one is overruled.
 

 In Group Four point of error two, appellants allege the trial court erred in failing to eliminate the recovery of medical expenses awarded to Alfred DeJuan Franklin, because a wrongful death beneficiary cannot recover personal medical expenses under Tex.Civ.Prac. & Rem.Code Ann. § 71.001 (Vernon 1986). Appellants present no argument or authorities, other than their reference to section 71.001, under this point of error.
 
 See
 
 Tex.R.App.P. 74(f);
 
 Davis v. City of San Antonio,
 
 752 S.W.2d 518, 522 (Tex. 1988);
 
 Trenholm v. Ratcliff,
 
 646 S.W.2d 927, 934 (Tex.1983);
 
 Elder v. Bro,
 
 809 S.W.2d 799, 801-02 (Tex.App. — Houston [14th Dist.] 1991, writ denied);
 
 Henry S. Miller Management Corp. v. Houston State Assocs.,
 
 792 S.W.2d 128,134 (Tex.App. — Houston [1st Dist.] 1990, writ denied);
 
 King v. Graham Holding Co.,
 
 762 S.W.2d 296, 299 (Tex.App. — Houston [14th Dist.] 1988, no writ). Section 71.001 simply provides the statutory definitions for the terms “corporation” and “person.”
 
 See
 
 Tex.Civ.Prac. & Rem.Code Ann. § 71.001 (Vernon 1986). We find nothing on the face of the cited section to require this Court to sustain the point of error. Group Four point of error two is overruled.
 

 In Group Four point of error three, appellants contend the trial court erred in failing to limit the recovery of exemplary damages to four times actual damages under Tex.Civ. Prac. & Rem.Code Ann. § 41.007 (Vernon Supp.1993). Appellants present no argument or authorities, other than their reference to section 41.007, under this point of error. However, section 41.007 does directly pertain to their complaint and the language of 41.007 on its face does require us to sustain the point of error.
 

 Section 41.007 states: “Except as provided by Section 41.008, exemplary damages awarded against a defendant may not exceed four times the amount of actual damages or $200,000, whichever is greater.” Tex.Civ.Prac. & Rem.Code Ann. § 41.007 (Vernon Supp.1993). The section referenced, 41.008, states: “Section 41.007 does not apply to exemplary damages resulting from malice as defined by Section 41.001(6)(A) or to an intentional tort.”
 
 Id.
 
 § 41.008. Although the jury made a finding of malice in this case
 
 *529
 
 and there is sufficient evidence to support such a finding, there is not evidence sufficient to support the type of malice defined under section 41.001(6)(A), i.e., that MoPac’s conduct was specifically intended by MoPac to cause substantial injury to Sharon Lemon.
 
 See id.
 
 § 41.001(6)(A). Thus, the $10,000,000 exemplary damages award must be reduced to four times the actual damages, making the proper award of exemplary damages $8,872,-073.12. Group Four point of error three is sustained and the award of exemplary damages is reduced accordingly.
 

 In Group Four point of error four, appellants argue the trial court erred in awarding prejudgment interest on future damages. They allege article 5069-1.05, section 6(a), which permits such prejudgment interest to be awarded violates their right to due process.
 

 As part of the Tort Reform Legislation enacted in 1987, article 5069-1.05 was amended to add section 6, regarding prejudgment interest.
 
 See
 
 Tex.Rev.Civ.Stat. Ann. art. 5069-1.05, § 6 (Vernon Supp.1993). The new section 6 states in pertinent part: “Judgments in wrongful death ... cases must include prejudgment interest.”
 
 Id.
 
 at art. 5069-1.05, § 6(a).
 

 Appellants contend that interest is allowed for the detention of money, and thus, the award of interest on sums not yet due violates due process. Appellees attempt to make light of this assertion, by arguing that future damages became “due” the moment Sharon Lemon was killed; the awards for future damages included in the judgment are due and could be collected now except for the supersedeas bond filed by appellants; and prejudgment interest on these damages is just as constitutional as the future damages themselves. The problem with this logic should be self-evident.
 

 At the moment Sharon Lemon was killed a cause of action accrued for damages against the defendants/appellants. Damages of any sort do not become “due” until there has been a determination of liability. Once liability was decided against the defendants/appellants and the amount of damages was determined, a judgment was entered and damages were “due.” There are two types of damages covering two different time periods, past and future. Past damages are the monetary equivalent of the harm or injuries
 
 actually suffered
 
 by plaintiffs/appel-lees from the time of injury, Sharon Lemon’s death, to the date of judgment. After liability was found, these damages were deemed to have been due and owing from the date of the injury. Prejudgment interest is properly awarded on the portion of these damages (past damages) that has accrued during the statutorily prescribed period “beginning on the 180th day after the date the defendant receives written notice of a claim or on the day the suit is filed, whichever occurs first, and ending on the day preceding the date judgment is rendered” to compensate plaintiffs/appellees for defendants’/appellants’ detention of their money during this time period.
 
 Id.
 
 at art. 5069-1.05, § 6(a) (Vernon Supp.1993). Future damages are the monetary equivalent of the harm or injuries
 
 not yet actually sustained
 
 by the plaintiffs/appel-lees, but which they will suffer from the date of judgment forward in time. These damages are due from the date of judgment and are to be paid to plaintiffs/appellees now as compensation for future harm, or for injuries that will be sustained in the future. Obviously, such amounts awarded as future damages did not accrue between the time of injury and the date of judgment, i.e., prejudgment. Therefore, defendants/appellants have not been detaining plaintiffs’/appellees’ money for these future damages during the time period prior to the date of judgment, and an award of prejudgment interest on this amount would be improper. Interest cannot be awarded on an amount not yet owed, and this would defeat the purpose of prejudgment interest which is to provide plaintiffs/appellees full compensation by awarding interest on damages that
 
 have actually been sustained. See Cavnar v. Quality Control Parking, Inc.,
 
 696 S.W.2d 549, 554-55 (Tex. 1985). Post-judgment interest, which has long been provided for by article 5069-1.05, is awarded on the entire judgment amount and accrues from the date judgment is entered until the date the judgment is satisfied.
 
 See
 
 Tex.Rev.Civ.Stat.Ann. art. 5069-1.05, § 3(a) (Vernon Supp.1993). In this manner
 
 *530
 
 plaintiffs/appellees are compensated for defendants’/appellants’ detention of all of their money, including future damages, after judgment is entered.
 

 Appellants cite us to a First Court of Appeals opinion, which interpreted the amended article 5069-1.06, section 6 and held “that the law in Texas now allows recovery, in wrongful death cases, of prejudgment interest on future damages.”
 
 C & H Nationwide, Inc. v. Thompson,
 
 810 S.W.2d 259, 276 (Tex.App.—Houston [1st Dist.] 1991, writ granted). As appellants correctly note in their brief, the Texas Supreme Court on May 27, 1992 granted writ to address this very issue in the
 
 C & H Nationwide
 
 case.
 

 The
 
 C & H Nationwide
 
 opinion relied upon the fact that the new language of the statute did not make a distinction between past damages and future damages awarded in a judgment, and the statement of Senator Montford, the primary author of the tort reform legislation, that the new law expands prejudgment interest to future damages which are included in the judgment.
 
 Id.
 
 (citing John T. Montford & Will G. Barber,
 
 1987 Texas Tort Reform: The Quest for a Fairer and More Predictable Texas Civil ■Justice System Part One,
 
 25 Hous.L.Rev. 59, 102-03 (1988)). If indeed this was the legislature’s intent in amending article 5069-1.05, to add section 6, we would find such a result to be unconstitutional.
 

 Although this Court, in construing a statute, is to ascertain the intent of the legislature and give effect to that intent, we must presume that the legislature did not act unreasonably or arbitrarily.
 
 McCulloch v. Fox & Jacobs, Inc.,
 
 696 S.W.2d 918, 921, 923 (Tex.App. — Dallas 1985, writ refd n.r.e.). “In passing upon the constitutionality of a statute, we begin with a presumption of validity.”
 
 Smith v. Davis,
 
 426 S.W.2d 827, 831 (Tex. 1968). Additionally, where a statute is subject to more than one interpretation, one which is constitutional and one which is not, we must construe the statute and give it effect in a constitutional manner. The logical construction of amended article 5069-1.05 is that the legislature added section 6 to ensure plaintiffs are fully compensated by awarding interest on damages that have actually been sustained during the statutory accrual period discussed above.
 
 See
 
 Tex.Rev.Civ.Stat.Ann. art. 5069-1.05, § 6(a) (Vernon Supp.1993). Such action by the legislature gives statutory effect to the concept discussed by the Texas Supreme Court in
 
 Cavnar
 
 and sets out the accrual periods for such interest which the legislature found to be appropriate. There was no need to differentiate in the statute between past and future damages since as a matter of law interest cannot be awarded on damages until those damages are actually sustained. Further, the term “prejudgment” on its face is unambiguous, and applies to damages sustained prior to judgment.
 

 To require a defendant to pay interest on a debt, where the interest is calculated as accruing during a time period when a portion of the debt is not due and owing would indeed be a violation of due process. Thus, we hold that article 5069-1.05, section 6 does not authorize prejudgment interest on future damages and it was improper in this case to make such an award. In this manner the statute is given a constitutional interpretation and plaintiffs/appellees are still guaranteed full and just compensation.
 

 The only differentiation between past and future damages awarded in this case is found in the jury’s answers to question thirteen. As discussed in Group Three point of error twelve, question thirteen inquired as to the damages to Sharon Lemon’s automobile, her medical treatment and funeral and burial expenses. These items are clearly past damages. The jury found Sharon Lemon’s medical expenses were $1,038.00, her funeral and burial expenses were $3,980.28, and her automobile damages were $3,000.00. These past damages total $8,018.28, and appellees are entitled to prejudgment interest on this sum. However, there was no other differentiation between past and future damages awarded. Therefore, we must strike the remainder of the award of prejudgment interest from the trial court’s judgment.
 
 See Cavnar,
 
 696 S.W.2d at 556. With the exception of prejudgment interest on the past damages in question thirteen, we sustain Group Four point of error four.
 

 
 *531
 
 GROUP FIVE POINTS OF ERROR
 

 ADMISSION OF EVIDENCE
 

 Under Group Five, appellants raise a single point of error complaining the trial court erred in admitting the testimony of Wiley and Phillips over objection. They allege these witnesses were not properly identified and appellees failed to establish good cause for admitting their testimony as required by Tex.R.Civ.P. 215(5).
 

 Appellees, in their Third Supplemental Responses to Appellants’ Interrogatories and Requests for Production, responded to a request to identify persons with knowledge of relevant facts by stating: “Any and all individuals listed in [appellants’] Answers to Interrogatories (including supplements) or Responses to Request for Production (including supplements); and any and all individuals whose depositions have been taken or will be taken in the near future.” At the time this response was given, Wiley and Phillips had both been designated by appellants as persons with knowledge of relevant facts, and both had already been deposed. On the basis of these facts, the trial court found this to be a sufficient designation of these fact witnesses and their testimony was no surprise to appellants.
 

 The purpose of discovery is to allow parties to obtain the fullest amount of information prior to trial, to prevent trial by ambush, and to ensure that fairness prevails.
 
 City of Houston v. Goings,
 
 795 S.W.2d 829, 834 (Tex.App. — Houston [14th Dist.] 1990, writ denied). Appellees could have achieved the same result in this case by xeroxing or simply retyping appellants’ list of designated fact witnesses in order to respond to the interrogatories, and appellants would have had the same information they were given under the catchall designation. Additionally, Wiley and Phillips were employees of appellant, MoPac, and were both on the train crew with appellant, Johnson. The address, telephone number, and employment of Wiley and Phillips were well known to MoPac, and the relevant facts of which they were aware was known to both MoPac and Johnson. As we observed in our
 
 AmSav Group, Inc. v. American Savings & Loan Association
 
 opinion, the catchall designation in general is not the best way to identify persons with knowledge of relevant facts in response to an interrogatory.
 
 See AmSav Group, Inc. v. American Sav. & Loan Ass’n,
 
 796 S.W.2d 482, 486 (Tex.App. — Houston [14th Dist.] 1990, writ denied). However, the designation used here was sufficient and on the facts of this case we find the purposes of discovery were met. This is not a case where the witnesses were not identified at all.
 

 Wiley and Phillips were sufficiently identified in appellees’ answers to interrogatories and the trial court did not err in admitting their testimony. Appellants’ Group Five point of error is overruled.
 

 The judgment of the trial court in favor of appellees is affirmed. However, the trial court’s judgment is modified to reduce exemplary damages to $8,872,073.12 in compliance with Tex.Civ.PRAc. & Rem.Code Ann. § 41.007 (Vernon Supp.1993). The judgment of the trial court is further modified to allow prejudgment interest on past damages of $8,018.28 at 10% per annum from January 8, 1990 to April 18, 1991, and to delete the award of prejudgment interest on the remaining actual damages. Accordingly, we affirm as modified.
 

 J. CURTISS BROWN, Chief Justice, concurring and dissenting.
 

 I would invoke our Constitutional fact finding powers to require a remittitur of the punitive damages to an amount equal to the actual damages found.
 

 No law or statute requires such a result and I would not apply it in all cases and certainly not in cases of intentional torts. However, in my opinion the appellate review of the award of the amount punitive damages in cases involving large actual damages should be mindful of the reasonableness of the overall amount found. Courts should be able to say “This is just too much.”
 

 Such an amount as I would allow in this case is sufficient to deter the defendant and avoids the award of excessive damages which may adversely affect commerce, employment, and the public regard for the judiciary. Exceptions should be made in proper cases.
 

 
 *532
 
 I therefore concur in the judgment and opinion of the Court with respect to all points other than the amount of punitive damages allowed.
 

 [1]
 

 . Based upon the Texas Supreme Court’s focus on simply answering the controlling question in a manner supported by the evidence, we question whether any error is preserved where an appellant fails to challenge on appeal all acts of negligence which the jury was instructed to consider under a broad form submission, and show that each act is not supported by sufficient evidence.
 
 See Greater Houston Transp. Co. v. Zrubeck,
 
 850 S.W.2d 579, 588-89 (Tex.App.—Corpus Christi 1993, writ requested) (addressed its analysis to a damages issue; we find Court's analysis more applicable to liability questions than to damages questions). Appellants apparently concede, and a review of the record reveals, there is ample evidence to support act of negligence (3), that Johnson failed to sound the tram’s horn and bell. We must presume the jury obeyed the trial court’s instruction to consider all three acts of negligence in arriving at its answer. The controlling question here is whether Johnson's negligence was a proximate cause of the collision. The failure to sound the horn and bell supports the jury’s affirmative answer to the controlling question, and is sufficient to uphold this answer on appeal. Thus, it appears, under broad-form submission, the appellant must demonstrate that none of the grounds relied on by the jury support the answer to a controlling liability question in order for reversal to be required. Nevertheless, we will address appellants' points on their merits.
 

 [2]
 

 .
 
 See supra
 
 text accompanying note 1. Under jury question two, appellants apparently concede, and a review of the record confirms, there was ample evidence to support the fact that the train cars were improperly (and illegally) parked too close to the MLK crossing. This fact is sufficient to support the jury’s affirmative answer to the controlling question regarding MoPac’s negligence and is sufficient to uphold the jury’s answer on appeal. However, we will, as we did under jury question one, address appellants’ points on their merits.
 

 [3]
 

 . Like the facts in the
 
 Easterwood
 
 case, appellants have not alleged that the MLK "crossing is located in, or near the terminus of a federal-aid highway project,” and therefore, the issue of the pre-emptive effect of, and "proper application of[,] 23 CFR § 646.214(b)(2) (1992) is not before us.”
 
 See Easterwood,
 
 — U.S. at-, 113 S.Ct. at 1741 n. 10.
 

 [4]
 

 . The definitions are:
 

 (i) Passive warning devices means those types of traffic control devices, including signs, markings and other devices, located at or in advance of grade crossings to indicate the presence of a crossing but which do not change aspect upon the approach or presence of a train.
 

 (j) Active warning devices means those traffic control devices activated by the approach or presence of a train, such as flashing light signals, automatic gates and similar devices, as well as manually operated devices and crossing watchmen, all of which display to motorists positive warning of the approach or presence of a train.
 

 23 CFR § 646.204(0, (j) (1992).
 
 See Easterwood,
 
 — U.S. at-, 113 S.Ct. at 1741 n. 11.
 

 [5]
 

 . For other discussions of the history of punitive damages in Texas,
 
 see General Chem. Corp.
 
 v.
 
 De La Lastra,
 
 815 S.W.2d 750 (Tex.App. — Corpus Christi 1991),
 
 affd in part, rev'd in part on other grounds,
 
 852 S.W.2d 916 (Tex. 1993); Sylvia M. Demarest,
 
 The History of Punitive Damages in Texas,
 
 28 S.TexL.Rev. 535 (1987).